IRVIN WESTON *v.* JOSIAH D. CUSHING AND LUCIUS B. WRIGHT.*

[ IN CHANCERY.]

*Variance. Costs.*

The orator set up in his bill a right as he claimed it, to the use of certain water for his joiner and wheelwright shop, and, to describe the extent of such claim, alleged a contract, and complained that the defendants had prohibited him any use of the water, either to the extent claimed, or less, and prayed, in case his right was not found as broad as his claim, that the extent thereof be ascertained and established. The court found that the orator had a right of the same nature as the one he claimed, though not to the full extent claimed, yet broad enough to render unjustifiable the act of the defendants complained of. *Held,* not a fatal variance, and that the orator was entitled to a decree establishing and defining such right.

The orator having prevailed upon the main issue in the case, though not to the full extent of his claim, yet to a greater extent than admitted by the defendants, was allowed costs.

APPEAL from the court of chancery. The original bill alleged that, in the year 1829, Peleg S. Marsh owned a grist-mill and a saw-mill, and the land whereon the same stood, situate on the east side of the third branch of White River, in Bethel village, and a dam across said branch, and a right to the use of the water of said branch for operating said mills, with which were connected two flumes ; that in that year, Daniel Weston, intending to erect a joiner and wheelwright shop a little below said mills, and on the same side of the stream, applied to the said Peleg for a grant of water to operate the necessary machinery thereof; that the said Peleg thereupon bargained and sold to the said Daniel the privilege of taking and conveying in the most convenient manner from said dam, or either of said flumes, water sufficient, and only sufficient, for the purpose aforesaid, except when the water of said stream was so low as not to flow over said dam, in which case the water thus taken was not to exceed a stream of twelve square inches. The bill set out said contract *in extenso,* but the finding of the court renders the further allegations in respect thereto immaterial.

* This case was decided at the February term, 1868.

The bill further alleged that, in the year 1830, the said Daniel commenced building said shop, as he had intended, but that a flood carried away all he had built; that in 1834, the orator formed a partnership with the said Daniel, which continued till 1855, during all which time they carried on the joiner and wheelwright business, and that at the time of forming said partnership the orator became an equal owner with the said Daniel of said water privilege; that in 1851, the said Daniel and the orator commenced to rebuild a joiner and wheelwright shop on the same site, and in 1852, when they wanted to take water thereto according to said contract, they were in doubt how best to do so, and therefore consulted the said Peleg in relation thereto, who thereupon made examination of the premises, and advised as to the manner of doing it, and that it was done accordingly, and water taken from the flume of said grist-mill by means of a penstock extending therefrom, through the wall of said grist-mill, to a flume in said shop; that thereafterwards water was thus taken and used for operating the necessary machinery of said shop, without objection on the part of the said Peleg, or any one claiming under him, until the 10th day of September, 1865, when the defendants, the then owners of said mills, commenced interfering with the orator, the then sole owner of said shop and water privilege, in his use of said water, and continued so to do until on or about the 30th day of October, 1865, when they wholly stopped said water, and claimed that the orator had no right to the use thereof in manner aforesaid.

The bill further alleged that the said Peleg died in 1860, and that the said defendants purchased said mills, with full knowledge of the rights of the orator in the premises, and took their deed thereof subject thereto.

*Prayer*, that the rights of the orator to the use of said water be ascertained and confirmed to him, his heirs and assigns, forever, and that the said defendants, and all persons claiming under them, or either of them, be perpetually enjoined, &c.; and for general relief.

The amendment to the bill alleged that, on the 12th of February, 1794, Joel Marsh owned the land whereon the above named

mills stand, and other land adjoining, and the whole water-privilege therewith connected, and then had a grist-mill and saw-mill, a dam and a flume, thereon, and that there was a fulling-mill situate just below said mills; that on that day, the said Joel, by indenture of that date, duly executed, acknowledged, and recorded, conveyed to one William Burbank, his heirs and assigns, forever, the privilege of the spot whereon said fulling-mill stood, and the privilege of taking water from said flume and dam above his said mills, for the purpose only of operating said fulling-mill at all times when it would not be to the damage of the grist-mill, and an equal right with the saw-mill of drawing water for that purpose, upon condition that the said Burbank, his heirs and assigns, should be at one eighth of the cost and expense of building said dam and flume, and of keeping the same in repair forever; that the rights and privileges thus conveyed to said Burbank came to, and vested in the Bethel Manufacturing Company, and that the said Daniel purchased the same, and said fulling-mill, and other land adjoining, of the said company, and paid therefor, and that it was agreed between the said Peleg and the said Daniel that the deed thereof should be executed to the said Peleg, and that he should re-convey the same to the said Daniel—except a little of the land which adjoined the said Peleg's—and in his conveyance thereof should modify said water privilege so it might be used and exercised for operating the machinery of the shop which the said Daniel intended to build as aforesaid, and that, in pursuance of said agreement, the said Daniel procured said company to execute the deed to the said Peleg, on the 6th October, 1829; that the land so purchased of said company was the land whereon the said Daniel intended to build said shop, and the orator's shop stands on a part thereof; and that, from negligence, the said Peleg never re-conveyed to the said Daniel according to said agreement.

The answer to the original bill denied the allegations thereof in regard to the making of the contract therein alleged, and set out the said conveyance from the said Joel to the said Burbank, and alleged that the said Daniel in 1829, claiming to own the rights and privileges of the said Burbank under said conveyance,

and intending to build a shop as stated in the bill, attempted to make such a contract as alleged in the bill, and to that end reduced such an one to writing, but that the said Peleg refused to sign the same, and that the same never was signed ; that when the penstock was put in as alleged in the bill, the said Peleg would not permit water to be taken by means thereof, until the said Daniel and the orator had made some agreement to pay for the use thereof, and that there was always a controversy about said water, and that the said Peleg, and all those claiming under him, always denied the right of the said Daniel and of the orator to take water for the use of a joiner and wheelwright shop, and that the restriction upon the use of said water contained in the said conveyance to the said Burbank, had never been waived, and insisted that the same was in full force, and admitted that the said Daniel and the orator had at all times been at one eighth of the expense of repairing the dam and flumes, as provided in said conveyance, and alleged that they never claimed any right to said water except thereunder, but claimed that by virtue thereof they had the right to use said water for operating the machinery of their said shop.

The answer to the amendment to the bill, admitted the conveyveyance to the said Peleg by said company, but denied that it was done under the agreement alleged. The further allegations thereof are immaterial.

The answer was traversed, and testimony taken. It appeared that the said Daniel, and other persons, used said water at one time for purposes other than running the necessary machinery of said shop, for which the said Daniel, on the 16th of October, 1858, paid the said Peleg $226.25, and took his receipt therefor, " for water over drawn in running extra machinery," and that on the 18th of said October, one R. S. Janes paid the said Peleg therefor the sum of $18.75, and took his receipt expressing it to be, " one quarter's rent from date for water to run the machinery formerly owned by James Weston, at the rate of $75 per year." The court of chancery, at the December term, 1867, BARRETT, Chancellor, without hearing, dismissed the bill, and the orator appealed.

*Hunton & Gilman* and *J. Converse*, for the orator.

*J. J. Wilson* and *D. C. Denison*, for the defendants.

The opinion of the court was delivered by

STEELE, ·J.   The defendants bought with notice of the orator's claim.   They, therefore, took their risk as to its validity.   That they were told, or that they believed the claim was unfounded, does not alter the case.   They stand on the rights of Peleg S. Marsh, and can make no better defense than he could have made if the suit had been brought against him while living and owning the premises.   The orator, in 1862, acquired the interest of Daniel Weston, and now owns the whole " fulling-mill right."   If that right, or privilege, is broader or more extended than when first granted in the lease of February 12, 1794, from Joel Marsh to William Burbank, it has become so by reason of some transaction between Daniel Weston and Peleg S. Marsh.   There is no record evidence of any such transaction.

I.   The orator claims that Daniel Weston made a trade with Peleg S. Marsh, by which Marsh sold him the right to use the privilege in the manner specified in the " unsigned lease."   Has the orator established this claim ?   It is very clear that they had negotiations in the direction indicated by that unsigned instrument, but the testimony from *witnesses*, in our judgment, falls short of proving that they finally settled and agreed upon all its terms, and the evidence from *occupation*, is as consistent with the theory that they had not so agreed, as with the theory that they had settled upon these terms, and the evidence from the *receipts* only tends to show that Weston was treated as having a right to some amount of water ·for his shop, and not that the extent of that right was defined in the unsigned lease.   Our conclusion on this branch of the case is, that the evidence fails to establish a right according to the terms of the unsigned lease.

II.   The orator claims that if he is not entitled to the enjoyment of the water according to the terms of this unsigned instrument, he is entitled to use it according to the terms of the original lease from Joel Marsh to William Burbank, *discharged of its limitation to the uses of a fulling-mill*.   This claim accords with

the conduct of the parties. The erection of the wheelwright and joiner shop, to be operated by this water, was, unless Marsh had previously consented to the discharge of its limitation to use for the purposes of a fulling-mill, an unusually foolhardy enterprise. The objections which Marsh is shown to have urged against the unsigned lease, were not that by its terms it discharged this limitation, or that he had not consented to the erection of a wheelwright shop, but that the lease by its terms granted too large an amount of water. The receipts for rent indicate that the right of Daniel Weston to *some* water for purposes other than " fulling-mill uses," was conceded. Such, too, we think, is the general tenor of the oral testimony. Add to this the fact or circumstance that it made comparatively little difference with Marsh what use Weston made of the water to which he was entitled, provided it was not used to run a competing saw or grist-mill, and there would seem to be no serious doubt but the wheelwright and joiner's shop was erected in reliance upon Marsh's consent to the discharge of the privilege, or right, from its limitation to the uses of a fulling-mill. So far as Marsh had a material and substantial interest in the limitation, that is, to the extent of restraining parties from the erection of competing mills, we think it reasonable to conclude that he waived no right.

III. Upon this finding of the facts, is the orator entitled to a decree ? There would be more force in the defendant's claim, that upon this finding there is a fatal variance between the case as alleged and the case as proved, if the bill depended entirely in contract. It is not so much a proceeding to enforce a contract, as to establish and define the extent of a right. The orator sets up the right as he claims it, and to describe the extent of that claim, alleges the contract ; but he complains that the defendants have prohibited him *any* use of the water for his shop, either to the extent he claims it, or less, and he specifically prays the court, in case they do not find his right as broad as his claim, to establish and decree to what extent he is entitled to the use of the water. The wrongful act he complains of, is the defendant's shutting him off from the use of the water for his shop. Upon the finding that the orator has a right of the same nature as the one he claims, and which, though it does not go to the full extent

he claims, is yet broad enough to render unjustifiable the defendant's act which is complained of, the orator becomes entitled to a decree in his favor, establishing and defining that right, in answer to his prayer therefor.   The proceeding, when properly considered, not being upon the contract, the rules relating to a variance between the contract as alleged and as proved, do not apply, and the case upon this finding, stands as it would if the defendants had answered, admitting all the court have found, and denying that the orator was entitled to the water according to the terms of the unsigned lease.   Heard upon such a bill and answer, the case could have only resulted in a decree for the orator to the extent that his claim was conceded.   This reasoning applies to the question of costs.   The fundamental issue in this case, stated categorically, is this, has the orator a right to the use of the water for other than fulling-mill purposes ?   Upon this question, the orator took the affirmative.   The defendants took the negative ; and took it as well by their answer, as by their act in prohibiting the orator *all* use of the water for his shop.   The orator having prevailed upon this question, it would seem no reason for denying him costs, that the court in defining his right do not concede it to the full extent he asks, so long as they give him more than the defendants would admit.

The result is, the court hold that the orator is entitled to a decree confirming to him, his heirs and assigns, the right to use water from the said privilege, unrestricted by, and discharged from, any limitation of its use to the purposes of a fulling-mill, but in other respects, subject to the terms, provisions, stipulations, and restrictions, contained in the lease of said right from Joel Marsh to William Burbank, by them signed, and dated February 12, 1794, and recorded in the town clerk's office of Bethel, February 13, 1794, and subject to the farther limitation, that said water shall not be used by said orator, his heirs or assigns, to run a saw or grist-mill.   The orator is also entitled to costs. ˙ The *pro forma* decree of the court of chancery is reversed ; and it is ordered that the cause be remanded to the court of chancery, to be perfected, and that decree there issue in accordance with the conclusions above stated.