# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2019AP96 |

| | |
|---|---|
| COMPLETE TITLE: | Friends of Frame Park, U.A., Plaintiff-Appellant, v. City of Waukesha, Defendant-Respondent-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 394 Wis. 2d 387, 950 N.W.2d 831
PDC No: 2020 WI App 61 - Published

| | |
|---|---|
| OPINION FILED: | July 6, 2022 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 9, 2021 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Waukesha |
| JUDGE: | Michael O. Bohren |

JUSTICES:
HAGEDORN, J., delivered the majority opinion of the Court with respect to ¶3, in which ZIEGLER, C.J., ROGGENSACK, and REBECCA GRASSL BRADLEY, JJ., joined, an opinion with respect to ¶¶13-24, in which ZIEGLER, C.J., and ROGGENSACK, J., joined, and an opinion with respect to ¶¶1-2, 4-12, 25-38. REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which ZIEGLER, C.J., and ROGGENSACK, J., joined. KAROFSKY, J., filed a dissenting opinion, in which ANN WALSH BRADLEY and DALLET, JJ., joined.
NOT PARTICIPATING:

ATTORNEYS:

For the defendant-respondent-petitioner, there were briefs filed by *John M. Bruce* and *West & Dunn, LLC*, Two Rivers. There was an oral argument by *John M. Bruce*.

For the plaintiff-appellant, there was a brief filed by *Joseph R. Cincotta* and *The Law Offices of Joseph R. Cincotta*, Milwaukee. There was an oral argument by *Joseph R. Cincotta*.

An amicus curiae brief was filed by *James A. Friedman, Maxted M. Lenz* and *Godfrey & Kahn, S.C.*, Madison, for the Wisconsin Broadcasters Association, the Wisconsin Freedom of Information Council, the Wisconsin Newspaper Association, the Wisconsin Transparency Project, and the Reporters Committee for Freedom of the Press. There was an oral argument by *James A. Friedman*.

**2022 WI 57**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2019AP96
(L.C. No. 2017CV2197)

STATE OF WISCONSIN      :      IN SUPREME COURT

**Friends of Frame Park, U.A.,**

    **Plaintiff-Appellant,**

    **v.**

**City of Waukesha,**

    **Defendant-Respondent-Petitioner.**

**FILED**

**JUL 6, 2022**

Sheila T. Reiff
Clerk of Supreme Court

---

HAGEDORN, J., delivered the majority opinion of the Court with respect to ¶3, in which ZIEGLER, C.J., ROGGENSACK, and REBECCA GRASSL BRADLEY, JJ., joined, an opinion with respect to ¶¶13-24, in which ZIEGLER, C.J., and ROGGENSACK, J., joined, and an opinion with respect to ¶¶1-2, 4-12, 25-38. REBECCA GRASSL BRADLEY, J., filed a concurring opinion, in which ZIEGLER, C.J., and ROGGENSACK, J., joined. KAROFSKY, J., filed a dissenting opinion, in which ANN WALSH BRADLEY and DALLET, JJ., joined.

---

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 BRIAN HAGEDORN, J. In this public records case, the City of Waukesha denied access to a draft contract with a private entity to protect ongoing negotiations and until it consulted with the City's Common Council. The requester brought a mandamus action seeking access to the withheld contract. Two

days later, after a meeting of the Common Council, the City turned over the record to the requester.

¶2 The first issue in this case relates to attorney's fees in public records cases. The parties disagree over the test we should use to determine whether the requester, in the statute's words, "prevail[ed] in whole or in substantial part," and is therefore entitled to attorney's fees. Wis. Stat. § 19.37(2)(a) (2019-20).[1] The court of appeals has previously employed a causal-nexus test——querying whether the release of records was caused in some way by the litigation. In this case, where the records custodian voluntarily turned over the requested record, the court of appeals recognized the limitations of a causation-based approach and considered whether the records were properly withheld in the first place. This is the first occasion for this court to fully analyze what it means for a party to "prevail[] in whole or in substantial part" under § 19.37(2)(a). Faced with these varying approaches, we conclude we must return the analytical framework to one more closely tethered to the statutory text. The varying tests utilized by the court of appeals in the past do not track the meaning of the words the legislature used.

¶3 Four justices agree that to "prevail[] in whole or in substantial part" means the party must obtain a judicially

---

[1] All subsequent references to the Wisconsin Statutes are to the 2019-20 version unless otherwise indicated.

2

sanctioned change in the parties' legal relationship. Accordingly, a majority of the court adopts this principle.

¶4 This conclusion arguably raises other statutory questions. Prior court of appeals cases have held that a requester could still pursue attorney's fees even if the records have been voluntarily turned over. This conclusion rested on its causation-based theory, however. The concurrence argues that under the proper statutory test we announce today, a mandamus action becomes moot after voluntary compliance, and record requesters have no separate authority to pursue attorney's fees. We save this issue for another day. Even if record requesters can pursue attorney's fees following release of the requested records, an award of fees would not be appropriate here. This is so because in temporarily withholding the draft contract, the City complied with the public records law. Applying the balancing test, the City pointed to the strong public interest in nondisclosure——namely, protecting the City's negotiating and bargaining position and safeguarding the Common Council's prerogative in contract approval. These considerations outweigh the strong public policy in favor of disclosure. Furthermore, the City recognized the balance of interests would shift after the Common Council meeting, and it properly disclosed the draft contract at that time. Therefore, the City did not violate the public records law. And thus, the requester did not and could not prevail in whole or substantial part in this action. Therefore, no judicially sanctioned change

in the parties' relationship is appropriate and the requester is not entitled to any attorney's fees.

## I. BACKGROUND

¶5 Friends of Frame Park, U.A. (Friends) is an association composed of several members who own property, work, and pay taxes to the City of Waukesha and make use of City parks, including Frame Park. Friends sent the City a public records request on October 9, 2017, seeking information about the City's plans to bring amateur baseball to Waukesha.[2] The request stated in part: "Please include any Letters of Intent (LOI) or Memorandum of Understanding (MOU) or Lease Agreements between Big Top Baseball and or Northwoods League Baseball and the City of Waukesha during the time frame of 5-1-16 to the present time frame."

¶6 The City responded two weeks later. It provided all documents responsive to Friends' request except a draft contract with Big Top Baseball. The City explained its decision to temporarily withhold the document as follows:

> A park use contract with Big Top Baseball is presently in draft form. Because the contract is still in negotiation with Big Top, and there is at least one other entity that may be competing with the City of

---

[2] Friends' registered agent, Scott Anfinson, made this public records request; Friends was formally established a month later, in November 2017. The circuit court held that Friends was a proper party to bring an action in connection with the public records request signed by Mr. Anfinson. The City did not challenge this ruling on appeal. Thus, this opinion refers to the records requestor as Friends.

Waukesha for a baseball team, the draft contract is being withheld from your request, pursuant to Wis. Stats. §§ 19.35(1)(a) and § 19.85(1)(e). This is to protect the City's negotiating and bargaining position. The draft contract is subject to review, revision, and approval of the Common Council before it can be finalized, and the Common Council have not yet had an opportunity to review and discuss the draft contract. Protecting the City's ability to negotiate the best deal for the taxpayers is a valid public policy reason to keep the draft contract temporarily out of public view - Wis. Stats. § 19.35(1)(a) states that exemptions to the requirement of a governmental body to meet in open session are indicative of public policy in this regard, and Wis. Stats. § 19.85(1)(e) exempts from open session "[d]eliberating or negotiating the purchasing of public properties, the investing of public funds, or conducting other specified public business, whenever competitive or bargaining reasons require a closed session." There currently is a need to restrict public access for competitive and bargaining reasons until the Council has an opportunity to review the draft and determine whether it wants to adopt it or set different parameters for continued negotiations with the interested parties. If the contract's terms were made public, it would substantially diminish the City's ability to negotiate different terms the Council may desire for the benefit the City.

Because the City's negotiating and bargaining position could be compromised by public disclosure of the draft contract before the Common Council have had an opportunity to consider the draft, after applying the balancing test, the public's interest in protecting that negotiating and bargaining position outweighs the public's interest in disclosing the draft contract at this point. You will get a copy of the contract after the Common Council has taken action on it.

¶7 Friends believed the City improperly withheld the draft contract and knew the use of Frame Park was on the Common Council meeting agenda for December 19, 2017. So the day before the Common Council meeting, in order to preserve its remedies,

5

Friends filed a mandamus action under Wis. Stat. § 19.37(1) seeking production of the draft contract, attorney's fees, and other expenses. The following evening, the City's Common Council met. It is unclear from the meeting minutes whether, or to what extent, the draft contract was discussed. The minutes note the following with respect to Frame Park: "Citizen speakers registering comments against baseball at Frame Park"; the "City Administrator's Report" included a "Northwoods Baseball League Update"; and an "item for next Common Council Meeting under New Business" was to, "Create an ADHOC Committee for the purpose to address Frame Park and Frame Park issues."

¶8 The next day, on December 20, 2017, the City released the draft contract to Friends.[3] Consistent with its explanation initially denying release, the City explained the documents "are being released now because there is no longer any need to protect the City's negotiating and bargaining position."

¶9 Friends then amended its complaint, asking the circuit court[4] to hold that the City improperly withheld the draft contract. In advance of trial, the City filed a motion for

---

[3] Friends included the draft contract in its appendix to its response brief, despite the court of appeals admonition that submission of the draft contract was improper. Friends of Frame Park, U.A. v. City of Waukesha, 2020 WI App 61, ¶12 n.5, 394 Wis. 2d 387, 950 N.W.2d 831. Our review is limited to materials in the record. See Roy v. St. Lukes Med. Ctr., 2007 WI App 218, ¶10 n.1, 305 Wis. 2d 658, 741 N.W.2d 256. The draft contract was not made a part of the record before us; therefore, we do not consider the draft contract in making our decision.

[4] The Honorable Michael O. Bohren of the Waukesha County Circuit Court presided.

6

summary judgment which the circuit court granted; Friends did not move for summary judgment. The circuit court concluded the City "properly withheld certain public records temporarily in response to the record request made by [Friends] for the reasons set forth in the letter . . . and appropriately relied on Wis. Stat. § 19.85(1)(e) as the basis for doing so under the circumstances of this case." It further concluded that Friends was not entitled to attorney's fees under Wis. Stat. § 19.37(2).[5]

¶10 Friends appealed, and the court of appeals reversed. Friends of Frame Park, U.A. v. City of Waukesha, 2020 WI App 61, 394 Wis. 2d 387, 950 N.W.2d 831. The court concluded that the City's reliance on the negotiating and bargaining "exception was unwarranted and led to an unreasonable delay in the record's release." Id., ¶5. Regarding attorney's fees, the court explained that in most cases the court of appeals has utilized a causation-based test, but it determined that test did not make sense in this case. Id., ¶3. Rather, the court of appeals held that "the key consideration is whether the authority properly invoked the exception in its initial decision to withhold release." Id., ¶4. Using this approach, and based on its conclusion that the City erred in withholding the record, the court determined that Friends was "entitled to some portion of its attorney's fees" and remanded the cause to the circuit court

---

[5] The circuit court also granted summary judgment for the City with respect to subsequent records requests made by Friends. Friends did not appeal this aspect of the decision.

to ascertain the amount. Id., ¶5. We granted the City's petition for review.

## II. DISCUSSION

¶11 Procedurally, this case is a review of the circuit court's decision to grant summary judgment, which we review independently. J. Times v. City of Racine Bd. of Police & Fire Comm'rs, 2015 WI 56, ¶42, 362 Wis. 2d 577, 866 N.W.2d 563. Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Wis. Stat. § 802.08(2).

¶12 The two questions before us concern entitlement to attorney's fees under Wis. Stat. § 19.37(2)(a), and whether the City properly withheld the draft contract until after the Common Council meeting. These are questions of statutory interpretation and application which we review independently. J. Times, 362 Wis. 2d 577, ¶42.

### A. Attorney's Fees Under the Public Records Law

¶13 When "an authority withholds a record or a part of a record or delays granting access to a record or part of a record after a written request for disclosure is made" the record requester may "bring an action for mandamus asking a court to order release of the record" or may request the district

8

attorney to bring a mandamus action.  Wis. Stat. § 19.37(1).
Section 19.37 provides that the record requester may be entitled
to various damages and fees as a result of the mandamus action.
See § 19.37(2)-(4).  Relevant to this case, § 19.37(2)(a)
contains the following fee-shifting provision:

> Except as provided in this paragraph, the court shall
> award reasonable attorney fees, damages of not less
> than $100, and other actual costs to the requestor <u>if
> the requester prevails in whole or in substantial part</u>
> in any action filed under sub. (1) relating to access
> to a record or part of a record under [Wis. Stat.
> §] 19.35(1)(a).

(Emphasis added).  Besides attorney's fees, the law also
specifies that the circuit court shall award actual damages if
"the authority acted in a willful or intentional manner" and may
award punitive damages if the authority "arbitrarily and
capriciously denied or delayed response to a request or charged
excessive fees."  § 19.37(2)(b), (3); see also Cap. Times Co. v.
Doyle, 2011 WI App 137, ¶¶7, 11, 337 Wis. 2d 544, 807 N.W.2d 666
(concluding actual and punitive damages are limited to mandamus
actions).

¶14 Wisconsin Stat. § 19.37(2)(a)——the attorney's fees
provision at issue here——was originally enacted in 1982 and was
comparable to the then-existing fee-shifting provision in the
federal Freedom of Information Act (FOIA).  FOIA provided that
courts "may assess against the United States reasonable attorney
fees and other litigation costs reasonably incurred in any case
under this section in which a complainant has <u>substantially</u>

9

prevailed."[6]  5 U.S.C. § 552(a)(4)(E) (1976) (emphasis added). But what does it mean to "prevail" under these statutes?

¶15 The answer to this question in Wisconsin and in federal courts has centered on two alternatives:  a causation-based approach, and an interpretation that requires some judicially sanctioned change in the parties' legal relationship. The latter definition is endorsed by the United States Supreme Court and is the better interpretation of "prevails" in Wis. Stat. § 19.37(2)(a).  To explain why, we explore how these two approaches came to be.


1.  Causal-Nexus Test

¶16  In Wisconsin, the court of appeals first considered the meaning of Wis. Stat. § 19.37(2)(a) in Racine Education Ass'n v. Board of Education for Racine Unified School District (Racine I), 129 Wis. 2d 319, 385 N.W.2d 510 (Ct. App. 1986). There, the court of appeals concluded the statutory language "prevails in whole or substantial part" failed to provide any criteria and was unclear.  Id. at 326.  It therefore turned to federal case law interpreting FOIA's fee shifting provision. Id. at 326-28.

---

[6] Under the federal statute, this is just the start of the inquiry into whether a party is entitled to receive attorney's fees.  Unlike Wis. Stat. § 19.37(2)(a), FOIA permits but does not require a court to grant attorney's fees.  The determination of whether to award fees ultimately rests with the district court, which is instructed to consider several non-exhaustive factors in making its determination.  See Church of Scientology of Cal. v. Harris, 653 F.2d 584, 590 (D.C. Cir. 1981).

¶17 It found persuasive the D.C. Circuit's decision in Cox v. United States Department of Justice, 601 F.2d 1 (D.C. Cir. 1979) (per curiam). The court in Cox held that a party could seek fees under FOIA "in the absence of a court order" if "prosecution of the action could reasonably be regarded as necessary to obtain the information and that a causal nexus exists between that action and the agency's surrender of the information." Id. at 6 (citations omitted). This later became known as the "catalyst theory," an interpretation "which posits that a plaintiff is a 'prevailing party' if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health and Hum. Res., 532 U.S. 598, 601 (2001). The court of appeals in Racine I adopted "the Cox analysis for use in determining whether a party has 'prevail[ed] in whole or in substantial part'" under Wis. Stat. § 19.37(2)(a). 129 Wis. 2d at 328 (alteration in original).

¶18 Although the test has evolved somewhat since Racine I,[7] the court of appeals has generally held that a party "prevails"

_____

[7] Subsequent cases mixed the federal catalyst theory with Wisconsin's causation analysis for common law negligence.

> The test of cause in Wisconsin is whether the actor's action was a substantial factor in contributing to the result. The phrase "substantial factor" denotes that the actor's conduct has such an effect in producing the result as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense.

State ex rel. Vaughan v. Faust, 143 Wis. 2d 868, 871-72, 422 N.W.2d 898 (Ct. App. 1988) (citing Merco Distrib. Corp. v. Com.

11

in a public records action if there is a causal nexus between the requestor bringing the action and the defendant providing the requested records.

## 2. Judicially Sanctioned Change in the Parties' Legal Relationship

¶19 Federal courts have not followed in step, however. In 2001, the United States Supreme Court concluded that the D.C. Circuit's approach in Cox——the case Racine I relied on——is inconsistent with the proper understanding of what it means to prevail in a lawsuit. Buckhannon, 532 U.S. 598. In Buckhannon, the Court considered the meaning of the term "prevailing party" in the fee-shifting provisions of the Fair Housing Amendments Act (FHAA) and the Americans with Disabilities Act (ADA).[8]

---

Police Alarm Co., 84 Wis. 2d 455, 458-59, 267 N.W.2d 652 (1978) (analyzing the causation element of common law negligence)). In Faust, the court of appeals further explained that "but for" causation was not required. Id. at 872-73. And in WTMJ, Inc. v. Sullivan, the court of appeals noted, "The action may be one of several causes; it need not be the sole cause." 204 Wis. 2d 452, 458-59, 555 N.W.2d 140 (Ct. App. 1996).

We have mentioned the causation test before. See J. Times v. City of Racine Bd. of Police & Fire Comm'rs, 2015 WI 56, ¶57, 362 Wis. 2d 577, 866 N.W.2d 563. In Journal Times, we noted that "if the failure to timely respond to a request was caused by an unavoidable delay accompanied by due diligence in the administrative processes, . . . the plaintiff has not substantially prevailed." Id. However, we went on to conclude that the plaintiff was not entitled to attorney's fees because it "did not prevail in substantial part." Id., ¶104. We have not previously been presented a question squarely addressing the causation test or its contours.

[8] The fee-shifting provision under the FHAA provided, "[T]he court, in its discretion, may allow the prevailing party . . . a

Id. at 601.  It expressly rejected Cox's causation-based interpretation, concluding instead that "the term 'prevailing party'" refers to "one who has been awarded some relief by the court."  Id. at 603.

¶20 The Court explained that "prevailing party" is a "legal term of art."  Id. at 603.  It referenced Black's Law Dictionary, which defined "prevailing party" as a "party in whose favor a judgment is rendered, regardless of the amount of damages awarded . . . .——Also termed successful party."  Id. (citing Black's Law Dictionary 1145 (7th ed. 1999)).  The question therefore was simply whether there was a "court-ordered change in the legal relationship between the plaintiff and the defendant."  Id. at 604 (alteration omitted) (quoting another source).  And while a consent decree incorporating a settlement agreement may suffice to establish one's status as a prevailing party, a "defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit" does not suffice because it "lacks the necessary judicial imprimatur on the change."  Id. at 605.

¶21 In Buckhannon's aftermath, federal circuit courts promptly applied its interpretative analysis to the term

reasonable attorney's fee and costs."  Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health and Hum. Res., 532 U.S. 598, 601 (2001) (quoting FHAA, 42 U.S.C. § 3613(c)(2)). The fee-shifting provision under the ADA provided, "[T]he court . . . , in its discretion, may allow the prevailing party . . . a reasonable attorney's fee, including litigation expenses, and costs."  Id. (quoting ADA, 42 U.S.C. § 12205).

13

"substantially prevailed" in FOIA's fee shifting provision. E.g., Oil, Chem. & Atomic Workers Int'l Union, AFL-CIO v. Dep't of Energy, 288 F.3d 452, 456-57 (D.C. Cir. 2002); Union of Needletrades, Indus. & Textile Emps., AFL-CIO, CLC v. U.S. Immigr. & Naturalization Serv., 336 F.3d 200, 205-06 (2d Cir. 2003). Shortly thereafter, however, Congress amended FOIA to state that "a complainant has substantially prevailed if the complainant has obtained relief through either——(I) a judicial order, or an enforceable written agreement or consent degree; or (II) a voluntary or unilateral change in position by the agency, if the complainant's claim in not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii); see also Or. Nat. Desert Ass'n v. Locke, 572 F.3d 610, 614-15 (9th Cir. 2009). Several circuits since have interpreted the amendment as reinstating the pre-Buckhannon catalyst theory of recovery in the FOIA context. See First Amend. Coal. v. U.S. Dept. of Just., 878 F.3d 1119, 1128 (9th Cir. 2017) (collecting cases). Wisconsin's public records law, however, has not been similarly amended and does not contain the "voluntary or unilateral change" language of the amended FOIA provision.

¶22 The understanding of prevailing party expressed in Buckhannon is not unique to federal law. It has a long history in Wisconsin as well. In our earliest laws, numerous statutory provisions tied the concept of prevailing in an action to success in a judicial proceeding. E.g., Wis. Stat. ch. 102, § 6 (1849) ("[T]he plaintiff in error on the trial anew shall be the successful and prevailing party."); Wis. Stat. ch. 109, § 6

14

(1849) ("If the plaintiff in such action prevail therein, he shall have judgment for double the amount of damages found by the jury.").[9]   This was also true when § 19.37(2)(a)'s fee-shifting provision was enacted in 1982; many Wisconsin statutes on the books clearly tied a party's prevailing status to success in some judicial proceeding.[10]   Our cases reinforced this understanding.   Whiting v. Gould, 1 Wis. 198, 199 (1853)

---

[9] See also Wis. Stat. ch. 64, § 21 (1849) ("If . . . it shall appear to the court, that either the petition or the objection thereto is unreasonable, said court may, in its discretion, award costs to the party prevailing, and enforce the payment thereof."); Wis. Stat. ch. 106, § 29 (1849) ("[T]he judgment in the action, if the plaintiff prevail, shall be that the plaintiff recover the possession of the premises . . . .").

[10] E.g., Wis. Stat. § 52.10(6)(c) (1981-82) ("If proceedings have been initiated and the person demanded has prevailed therein the governor may decline to honor the demand."); Wis. Stat. § 109.03(6) (1981-82) ("In any [wage claim] proceeding the court may allow the prevailing party, in addition to all other costs, a reasonable sum for expenses."); Wis. Stat. § 655.19(1) (1981-82) ("In the case of a trial . . . the court may award actual court costs and reasonable attorney fees in excess of statutory limitations to the prevailing party."); Wis. Stat. § 807.01(2) (1981-82) ("If the plaintiff accepts the offer . . . and prevails upon the trial, either party may file proof of service of the offer and acceptance and the damages will be assessed accordingly."); Wis. Stat. § 811.21 (1981-82) ("If the defendant prevails in the action or if the action be discontinued the damages sustained by him . . . shall be assessed and he shall have judgment therefore."); Wis. Stat. § 823.03 (1981-82) ("[W]hen the plaintiff prevails, he shall, in addition to judgment for damage and costs, also have judgment that the nuisance be abated unless the court shall otherwise order."); Wis. Stat. § 879.33 (1981-82) ("Costs may be allowed in all appealable contested matters in court to the prevailing party . . . ."); Wis. Stat. § 879.45(4) (1981-82) ("In all jury cases costs shall be allowed as a matter of course to the prevailing party.").

15

("Therefore, interlocutory costs . . . must follow the final adjudication, and may be taxed, by items, by the ultimately prevailing party . . . .").[11] Conversely, we have explained that a party does not prevail if "there is no final determination on the merits and the action does not end in judgment for one party or the other." DeGroff v. Schmude, 71 Wis. 2d 554, 568, 238 N.W.2d 730 (1976).

¶23 When the legislature uses a legal term of art with a broadly accepted meaning——as it has here with "prevails" in § 19.37(2)(a)——we generally assume the legislature meant the same thing. Mueller v. TL90108, LLC, 2020 WI 7, ¶19, 390 Wis. 2d 34, 938 N.W.2d 566 (noting that terms "with specific and distinct meaning in our common law" should be given "their accepted legal meaning"); Wis. Stat. § 990.01(1) ("[T]echnical words and phrases and others that have a peculiar meaning in the law shall be construed according to such meaning."). If the idea that a party could prevail in a lawsuit in the absence of court action was unknown in Wisconsin when this statute was adopted, we should not read that interpretation into the statute

---

[11] See also McCaffrey v. Nolan, 1 Wis. 361, 364 (1853) (noting that following a successful replevin action, an officer should "deliver the property to the prevailing party in the suit"); Pietsch v. McCarthy, 159 Wis. 251, 255, 150 N.W. 482 (1915) (holding a party was "the prevailing party" after obtaining a reversal on appeal); Farmers Grain Exch., Inc. v. Crull, 50 Wis. 2d 161, 164, 183 N.W.2d 41 (1971) (using the term "prevailing party" juxtaposed against a "losing party" that "attempts to relieve itself of a judgment").

16

now given the absence of any evidence that it was understood to have that meaning when enacted.

¶24 Buckhannon's interpretation comports with Wisconsin law. A causation or catalyst theory is not a comfortable fit with statutory text that allows recovery of attorney's fees "if the requester prevails in whole or in substantial part in any action." Wis. Stat. § 19.37(2)(a). The better course is to follow the United States Supreme Court's lead and return to a textually-rooted understanding of when a party prevails in a lawsuit. Absent a judicially sanctioned change in the parties' legal relationship, attorney's fees are not recoverable under § 19.37(2)(a).

### 3. Friends Is Not Entitled to Attorney's Fees

¶25 Previously, under the causal-nexus test, the court of appeals has held that although a mandamus action under Wis. Stat. § 19.37(1) becomes moot when the records custodian provides the requested records, the question of attorney's fees remains live and can be litigated. See Racine I, 129 Wis. 2d at 324-25. Without a causation-based theory governing the meaning of prevailing party under the statute, however, it is unclear whether voluntary compliance following the filing of a lawsuit could still allow a requester to pursue fees. Cf. Bjordal v. Town Bd. of Town of Delavan, 230 Wis. 543, 545-46, 284 N.W. 534 (1939); Buckhannon, 532 U.S. at 609. We reserve this question for another day. Even if attorney's fees may be awarded after the voluntary production of records, the City here did not

17

violate the law, as explained below. Friends therefore would not be entitled to any judicial relief——that is, it would not prevail in whole or substantial part——even if fees are available in this context. Accordingly, Friends is not entitled to attorney's fees either way.

### B. The Draft Contract Was Properly Withheld

¶26 To explain why the City properly withheld the draft contract, we begin by discussing the general principles which animate the public records law.

### 1. Public Records Law General Principles

¶27 Wisconsin's public records law begins with a strong declaration of public policy which provides in part, "The denial of public access generally is contrary to the public interest, and only in an exceptional case may access be denied." Wis. Stat. § 19.31. In light of this policy, "Except as otherwise provided by law, any requestor has a right to inspect any record."[12] Wis. Stat. § 19.35(1)(a). Therefore, once a legal custodian of a record receives a request, the custodian "shall, as soon as practicable and without delay, either fill the request or notify the requester of the authority's determination

---

[12] "Requester" and "Record" are statutorily defined terms in Wis. Stat. §§ 19.32-19.39. § 19.32(2), (3). The City does not argue that the draft contract fails to meet the definition of a record as defined in § 19.32(2).

to deny the request in whole or in part and the reasons therefor."[13]  § 19.35(4)(a).

¶28 When responding to the request, the custodian must first determine if there is a record or records that are responsive to the request.  J. Times, 362 Wis. 2d 577, ¶55.  If a requested record exists, and if no other statute either requires access or exempts the record,[14] the custodian must conduct the balancing test.  See Wis. Stat. § 19.35(1)(a) ("Substantive common law principles construing the right to inspect, copy or receive copies of records shall remain in effect.").  The balancing test is a common-law limitation "that the inspection [of a record] not be permitted if there is a specific showing that the public interest would be adversely affected."  State ex rel. J. Co. v. Cnty. Ct. for Racine Cnty., 43 Wis. 2d 297, 306, 168 N.W.2d 836 (1969).  If, after conducting the balancing test, the records custodian determines the records should be withheld, the custodian must, with specificity, provide reasons "for withholding the records . . . sufficient to outweigh the strong public policy favoring disclosure."[15]  Portage Daily Reg. v. Columbia Cnty.

---

[13] The legal custodians of various records are defined in Wis. Stat. § 19.33.

[14] See, e.g., Wis. Stat. §§ 19.36, 346.70(4)(f).

[15] This denial must be in writing (if the request was in writing) and contain "the reasons for denying the written request."  Wis. Stat. § 19.35(4)(b).  If denied for public policy reasons, the statement must be specific and include more than "a mere citation to the exemption statute."  Chvala v. Bubolz, 204 Wis. 2d 82, 86-87, 552 N.W.2d 892 (Ct. App. 1996).

Sheriff's Dept., 2008 WI App 30, ¶12, 308 Wis. 2d 357, 746 N.W.2d 525.

¶29 As previously discussed, if a record is withheld in whole or in part, or its release delayed, an action for mandamus can be brought to compel the record's release. Wis. Stat. § 19.37(1). In reviewing a mandamus action, we "examine the sufficiency of the custodian's stated reasons for denying the request." Osborn v. Bd. of Regents of Univ. of Wis. Sys., 2002 WI 83, ¶16, 254 Wis. 2d 266, 647 N.W.2d 158.

## 2. The Record Was Not Unlawfully Withheld

¶30 The City's decision to withhold the draft contract was based on the balancing test.[16] Although record custodians are obligated to conduct their own analysis, we conduct the public policy analysis the balancing test calls for independently. Wis. Newspress, Inc. v. Sch. Dist. of Sheboygan Falls, 199 Wis. 2d 768, 784, 546 N.W.2d 143 (1996).

¶31 The City cited Wis. Stat. §§ 19.35(1)(a) and 19.85(1)(e) as public policy reasons supporting its decision to withhold the record. Section 19.35(1)(a) is not itself a statutory exception to disclosure. Rather, it explains that the policies behind the open meetings exemptions in § 19.85 are indicative of the public policy interests that might exempt a

---

[16] There is no dispute that the City's written response denying access to the contract was sufficiently specific. The City referenced the pertinent statutes and public policy interests at play, and expressly weighed those interests against the public interest in disclosure.

record from disclosure under the balancing test.[17] Section 19.85(1)(e), in turn, states: "Deliberating or negotiating the purchasing of public properties, the investing of public funds, or conducting other specified public business, whenever competitive or bargaining reasons require a closed session." In other words, these types of issues may allow governmental bodies to meet in closed session, and therefore reflect strong public policy interests in nondisclosure that could also serve as a basis to withhold records.

¶32 Invoking the language in Wis. Stat. § 19.85(1)(e), the City explained that "the contract [was] still in negotiation with Big Top." Withholding disclosure was important to "protect the City's negotiation and bargaining position" and "the City's ability to negotiate the best deal for the taxpayers." Disclosure "would substantially diminish the City's ability to negotiate different terms the Council may desire for the benefit [of] the City" and "compromise[]" "the City's negotiating and bargaining position." The City further explained that the "draft contract is subject to review, revision, and approval of

---

[17] In relevant part, Wis. Stat. § 19.35(1)(a) provides:

The exemptions to the requirement of a governmental body to meet in open session under [Wis. Stat. §] 19.85 are indicative of public policy, but may be used as grounds for denying public access to a record only if the authority or legal custodian under [Wis. Stat. §] 19.33 makes a specific demonstration that there is a need to restrict public access at the time that the request to inspect or copy the record is made.

21

the Common Council before it can be finalized, and the Common Council [has] not yet had an opportunity to review and discuss the draft contract." The City indicated it would disclose the draft contract after the Common Council had taken action.

¶33 The circuit court correctly concluded the reasons set forth in the City's letter supported temporarily withholding the draft contract. Without question, the public interest in matters of municipal spending and development is significant. There is good reason for the public to know how government spends public money. This ensures citizen involvement and accountability for public funds. However, contract negotiation often requires a different calculus. Wisconsin Stat. § 19.85(1)(e) identifies the public interest in protecting a government's "competitive or bargaining" position in adversarial negotiation. It is not uncommon for the state or local municipalities to negotiate certain contracts in private, especially in competitive business environments. See, e.g., State ex rel. Citizens for Responsible Dev. v. City of Milton, 2007 WI App 114, ¶19, 300 Wis. 2d 649, 731 N.W.2d 640 ("Developing a negotiation strategy or deciding on a price to offer for a piece of land is an example of what is contemplated by 'whenever competitive or bargaining reasons require a closed session.'" (quoting § 19.85(1)(e))).

¶34 As illustrated here, the City communicated its belief that it was more likely to secure a better deal if its negotiations were not revealed early. The City was in talks with both Big Top Baseball and Northwoods League to bring a

22

baseball team to the City. Revealing its hand by disclosing the terms of a draft contract with Big Top Baseball could have negatively impacted the City's ability to bring a baseball team to the City on favorable terms. While no third-party competitor for a contract with Big Top Baseball or the Northwoods League was identified, this does not diminish the competitive nature of the negotiation. In a competitive bilateral negotiation, confidentiality is often critical to advancing a negotiation strategy. An identified third party may increase competition, but it is not a prerequisite for a competitive negotiation.

¶35 These negotiations were by no means a secret. In fact, in response to the records request, the City turned over other "correspondence with Big Top Baseball or Northwoods League Baseball related to a baseball project in Frame Park during 5-1-16 to the present time." The only responsive document the City withheld was the draft contract; every other responsive document was provided in a timely manner.

¶36 Moreover, while City employees were on-the-ground operators in a competitive negotiation with Big Top Baseball, it was ultimately the Common Council that bore the responsibility for the contract. "The general rule of municipal law is that only a duly authorized officer, governing body, or board can act on behalf of a city, and a valid contract with the municipality cannot be created otherwise." Town of Brockway v. City of Black River Falls, 2005 WI App 174, ¶24, 285 Wis. 2d 708, 702 N.W.2d 418. Here, the City explained to Friends that once the Common Council had an opportunity to consider the draft

23

contract, the balance of interests would shift. The City therefore said it would disclose the draft contract to Friends after the Common Council took action on it. In this context, it was reasonable to wait for consultation with the Common Council before revealing the current status of the negotiations to others.

¶37 Under these circumstances, the City's interest in withholding the draft contract to protect its bargaining position until the Common Council had the opportunity to consider the contract outweighed the public's interest in immediate release. The City properly applied the balancing test and did not violate the public records law by temporarily withholding the draft contract, nor did it delay release of the contract unreasonably. Accordingly, regardless of whether the issue of attorney's fees is moot, Friends is not entitled to attorney's fees because it did not prevail in whole or in substantial part on the merits of its mandamus action.

III. CONCLUSION

¶38 When ascertaining if a records requester is entitled attorney's fees as a part of a mandamus action under Wis. Stat. § 19.37(1), a party must "prevail[] in whole or in substantial part," which means the party must obtain a judicially sanctioned change in the parties' legal relationship. § 19.37(2)(a). With respect to the mandamus action before us, the City properly applied the balancing test when it decided to temporarily withhold access to the draft contract in response to Friends'

24

open records request. Accordingly, regardless of whether Friends may pursue fees after voluntary delivery of the requested record, Friends cannot prevail in its mandamus action and is not entitled to attorney's fees.

*By the Court.*—The decision of the court of appeals is reversed.

¶39 REBECCA GRASSL BRADLEY, J. *(concurring).* "What a metamorphosis would be produced in the code of law if all its ancient phraseology were to be taken in its modern sense." Letter from James Madison, to Henry Lee (June 25, 1824).[1] The judiciary risks destabilizing the law and usurping the legislature's law-making power when it fails to give "legal terms of art" in a statute their "accepted legal meaning." See Bank Mut. v. S.J. Boyer Const., Inc., 2010 WI 74, ¶23, 326 Wis. 2d 521, 785 N.W.2d 462 (quoting Estate of Matteson v. Matteson, 2008 WI 48, ¶22, 309 Wis. 2d 311, 749 N.W.2d 557). In a series of cases interpreting the public records law, the court of appeals modified the accepted legal meaning of a "prevailing party" in a court proceeding. That interpretive error requires correction.

¶40 Wisconsin Stat. § 19.37(2)(a) (2017–18)[2] employs a legal term of art. It states, in relevant part: "[T]he court shall award reasonable attorney fees . . . to the requester if the requester prevails in whole or in substantial part in any action filed under sub. (1) relating to access to a record or part of a record under s. 19.35 (1)(a)." § 19.37(2)(a). A party prevails in an action, in whole or in substantial part, only if it obtains favorable relief from a court. E.g., Prevailing party, Black's Law Dictionary (11th ed. 2019).

---

[1] https://www.loc.gov/resource/mjm.20_0907_0909/?sp=2&st=text.

[2] All subsequent references to the Wisconsin Statutes are to the 2017–18 version unless otherwise indicated.

1

¶41 The court of appeals has repeatedly failed to give the legal term of art in § 19.37(2)(a) its accepted legal meaning. In at least six cases,[3] the court of appeals has instead endorsed the now-defunct "catalyst theory," under which a party may be deemed to have prevailed——even in the absence of favorable relief from a court——if the lawsuit achieved at least some of the party's desired results by causing a voluntary change in the defendant's conduct.[4] See generally Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Hum. Res., 532 U.S. 598, 601 (2001). This line of court of appeals precedent (the "Racine Education Association I Line") relied on federal decisions that have been abrogated. More than 20 years ago, the United States Supreme Court decisively rejected the catalyst theory in Buckhannon, 532 U.S. at 602-05. In an even greater departure from the statutory text than the reasoning adopted in the Racine

---

[3] WTMJ, Inc. v. Sullivan, 204 Wis. 2d 452, 555 N.W.2d 140 (Ct. App. 1996); Eau Claire Press Co. v. Gordon, 176 Wis. 2d 154, 499 N.W.2d 918 (Ct. App. 1993); State ex rel. Eau Claire Leader-Telegram v. Barrett, 148 Wis. 2d 769, 436 N.W.2d 885 (Ct. App. 1989); Racine Educ. Ass'n v. Bd. of Educ. for Racine Unified Sch. Dist., 145 Wis. 2d 518, 427 N.W.2d 414 (Ct. App. 1988); State ex rel. Vaughan v. Faust, 143 Wis. 2d 868, 422 N.W.2d 898 (Ct. App. 1988); Racine Educ. Ass'n v. Bd. of Educ. for Racine Unified Sch. Dist., 129 Wis. 2d 319, 328, 385 N.W.2d 510 (Ct. App. 1986).

[4] As the majority/lead opinion notes, "[w]e have mentioned the causation test before;" however, "[w]e have not previously been presented a question squarely addressing the causation test or its contours." Majority/Lead op., ¶18 n.7. See generally J. Times v. City of Racine Bd. of Police & Fire Comm'r, 2015 WI 56, ¶57, 362 Wis. 2d 577, 866 N.W.2d 563.

Education Association I Line, in two cases,[5] (the "Young/Portage Cases") the court of appeals arguably abandoned the catalyst theory. According to the Young/Portage Cases, if a custodian improperly invokes an exception to the public records law and provides the requested record after the filing of a mandamus action, the requester is deemed to have prevailed and is entitled to attorney fees.

¶42 In this case, the court of appeals[6] erred in applying the Young/Portage Cases, embracing a purposivist and consequentialist approach to statutory interpretation, in derogation of the textualist approach Wisconsin courts are bound to follow. See State ex rel. Kalal v. Cir. Ct. for Dane Cnty., 2004 WI 58, 271 Wis. 2d 633, 681 N.W.2d 110.[7] Because these decisions are objectively wrong, we must overturn them in fulfilling our duty to properly interpret the law. See Wenke v. Gehl Co., 2004 WI 103, ¶21, 274 Wis. 2d 220, 682 N.W.2d 405 ("We are not required to adhere to interpretations of statutes that are objectively wrong." (internal citations omitted)).

---

[5] See State ex rel. Young v. Shaw, 165 Wis. 2d 276, 292-93, 477 N.W.2d 340 (Ct. App. 1991); Portage Daily Reg. v. Columbia Cnty. Sheriff's Dep't, 2008 WI App 30, ¶8, 308 Wis. 2d 357, 746 N.W.2d 525.

[6] Friends of Frame Park, U.A. v. City of Waukesha, 2020 WI App 61, 394 Wis. 2d 387, 950 N.W.2d 831.

[7] The same results-driven rationalizations permeate Justice Jill Karofsky's dissent, which does not even mention Kalal much less apply it.

3

¶43 I write separately because the majority/lead opinion[8] does not acknowledge this case is moot, obviating any need to address the merits. All records were given to the requester before the circuit court ever rendered a decision. See Racine Educ. Ass'n v. Bd. of Educ. for Racine Unified Sch. Dist., 129 Wis. 2d 319, 322, 385 N.W.2d 510 (Ct. App. 1986) (hereinafter "Racine Educ. Ass'n I"). A writ of mandamus under Wis. Stat. § 19.37(1) has a singular purpose: "to compel performance of a particular act by . . . a governmental officer, usu. to correct a prior action or failure to act." Mandamus, Black's Law Dictionary. In this case, the act requested had already been performed, so neither the circuit court nor the court of appeals nor this court needed to address the merits of Friends' public records claim.[9] Because this case is moot, we need not consider whether Friends is entitled to relief. Without favorable relief, Friends cannot recover attorney fees. Because the majority/lead opinion reaches the merits of this case without any explanation of what possible favorable relief could be granted, I respectfully concur.

---

[8] Wis. Sup. Ct. IOP III.G.5 ("If . . . the opinion originally circulated as the majority opinion does not garner the vote of a majority of the court, it shall be referred to in separate writings as the 'lead opinion[.]'").

[9] See Portage County v. J.W.K., 2019 WI 54, ¶12, 386 Wis. 2d 672, 927 N.W.2d 509 ("Appellate courts generally decline to reach moot issues, and if all issues on appeal are moot, the appeal should be dismissed. We may, however, choose to address moot issues in 'exceptional or compelling circumstances.'" (citations omitted)).

## I.  BACKGROUND

### A.  The Public Records Request

¶44 Friends was concerned about contract negotiations between the City of Waukesha ("City") and Big Top Baseball ("Big Top") to re-purpose Frame Park into a for-profit baseball stadium.  Friends filed a public records request with the City in October 2017.  The City disclosed some requested records, but withheld drafts of a proposed contract between the City and Big Top.  In a letter to Friends, the City Attorney explained the City temporarily withheld the draft contracts because:  (1) They had not yet been reviewed by the City's Common Council; (2) under Wis. Stat. § 19.85(1)(e), the Common Council could meet in closed session to review them; and (3) therefore, an exception to the public records laws, Wis. Stat. § 19.35(1)(a), applied.  The letter stated:  "You will get a copy of the contract after the Common Council has taken action on it."

### B.  The Mandamus Action

¶45 Friends learned the City Council might review the draft contracts at a meeting on December 19, 2017.  The day before the meeting, Friends filed a mandamus action under Wis. Stat. § 19.37(1)(a) to compel disclosure of the draft contracts.  In Friends' own words, it needed "to preserve its remedies"——i.e., an award of statutory attorney fees.  The day after the meeting, the City Attorney emailed Friends copies of the draft contracts, explaining they were "being released now because there is no longer any need to protect the City's negotiating and bargaining position."

5

¶46 The City moved for summary judgment, arguing the action was moot because it had turned over all responsive records——including the draft contracts. Friends countered that a live controversy existed regarding whether it could be awarded attorney fees. It argued: "The issue at stake here would never be litigated if a City could withhold records and then produce them after the court action was filed. The issue at stake is whether the exception invoked by the City was applicable under the law and thus validly invoked." Specifically, Friends argued the City incorrectly invoked Wis. Stat. § 19.85(1)(e) to delay releasing the draft contracts. Friends also seemed to assert that its lawsuit somehow caused the release of the draft contracts.

¶47 The circuit court granted the City's summary judgment motion.[10] It concluded Friends did not prevail in the action and therefore was not entitled to an award of attorney fees under Wis. Stat. § 19.37(2)(a) because the action was not a cause of the release of the draft contracts. In its written order, the circuit court explained: "The Plaintiff has not provided any evidence indicating that . . . records were disclosed by the Defendant in response to Plaintiff's commencement of this litigation." Instead, the circuit court found the City released

---

[10] The Honorable Michael O. Bohren, Waukesha County Circuit Court, presided.

6

the draft contracts because the exception on which it relied no longer applied.[11]

### C. The Appeal

¶48 The court of appeals reversed the circuit court and remanded with directions for the circuit court to determine the amount of attorney fees to be awarded.[12] It began by noting Wis. Stat. § 19.35(4)(a) instructs custodians to comply with requests "as soon as practicable and without delay."[13] It then concluded, "[a] plaintiff with standing to seek a withheld record in a mandamus action should generally be considered to have 'substantially prevailed' where it demonstrates a violation of this statute; that is, an unreasonable delay caused by the improper reliance on an exception."[14]

¶49 The court of appeals' reasoning seemed to rest on a desire to avoid what that court considered to be the consequences of bad public policy because interpreting the statute according to its text might encourage custodians to engage in bad-faith gamesmanship.[15] Specifically, a custodian might withhold requested records—perhaps in bad faith—but if litigation ensues, only then turn over a requested record.[16]

---

[11] The circuit court also concluded the City had properly invoked Wis. Stat. § 19.85(1)(e) to withhold the draft contracts.

[12] Friends of Frame Park, 394 Wis. 2d 387.

[13] Id., ¶4 (quoting Wis. Stat. § 19.35(4)(a)).

[14] Id.

[15] See id., ¶¶28-30.

[16] Id.

7

Instead of analyzing the statutory text, the court opted to incentivize "voluntary compliance" by increasing the risk custodians face if an action is brought.[17]

¶50 To reach its conclusion, the court of appeals endeavored to "reconcile what, at least superficially, appears to be inconsistent language from prior decisions addressing how and whether a public records plaintiff can recover attorney fees following voluntary release during litigation."[18]  The Racine Education Association I Line unambiguously requires the requester to show the action was a cause of the release of the record.  E.g., WTMJ, Inc. v. Sullivan, 204 Wis. 2d 452, 458, 555 N.W.2d 140 (Ct. App. 1996) (quoting State ex rel. Vaughan v. Faust, 143 Wis. 2d 868, 871, 422 N.W.2d 898 (Ct. App. 1988)). In the Young/Portage Cases, however, the court of appeals arguably eliminated the element of causation for at least a subset of disputes in which the custodian withheld the record in reliance on an exception rather than due to "unavoidable delays."  See State ex rel. Young, 165 Wis. 2d 276, 292-93, 477 N.W.2d 340 (Ct. App. 1991); see also Portage Daily Reg. v. Columbia Cnty. Sheriff's Dep't, 2008 WI App 30, ¶8, 308 Wis. 2d 357, 746 N.W.2d 525.  The Young/Portage Cases focused on whether the custodian was, in fact, entitled to withhold the record rather than what caused its release.

---

[17] Id., ¶29 (quoting Racine Educ. Ass'n I, 129 Wis. 2d at 328).

[18] Id., ¶4.

8

¶51 In this case, the court of appeals applied the Young/Portage Cases.[19] The court also relied heavily on Church of Scientology of California v. United States Postal Services, 700 F.2d 486 (9th Cir. 1983), abrogated in part on other grounds as recognized by First Amendment Coalition v. United States Department of Justice, 878 F.3d 1119, 1127 (9th Cir. 2017) (lead opinion). Under that case, three factors determine whether a requester prevailed: "(1) when the documents were released; and (2) what actually triggered the documents' release . . . ; and (3) whether the . . . [requester] was entitled to the documents at an earlier time in view of the fact that the exemption . . . [no longer applied]." Id. at 492. Our court of appeals deemed this three-factor test "a more flexible inquiry, one that permits consideration of factors other than causation."[20]

¶52 Notably, the court of appeals seemed to prioritize the third factor:

> The third factor——whether the requester was entitled to the record at an earlier time——should control where a delay in a voluntary release can be attributed to the authority's reliance on a public records exception. Where that is the case the trial court must scrutinize the claimed exception, rather than whether the lawsuit caused the release, to determine whether a requesting party has prevailed[.[21]]

---

[19] See id., ¶¶26, 32 (quoting Portage Daily Reg., 308 Wis. 2d 357, ¶8 and citing Young, 165 Wis. 2d at 286–91).

[20] Id., ¶32.

[21] Id., ¶33.

Applying this third factor——and seemingly only this factor——the court of appeals concluded:

> Here, there can be no question that the City withheld the draft contract on the claimed basis that a public records exception required nondisclosure; it later released the contract because it believed there was no longer a "competitive or bargaining" rationale to continue withholding it. There also is no doubt that the delay in disclosing this document . . . was not insignificant and the triggering event (according to the City) was the expiration of the exception on which nondisclosure was based. . . . Friends' claim for attorney's fees must hinge on whether the City appropriately invoked WIS. STAT. § 19.85(1)(e) to withhold disclosure until after the December 19 common council meeting.[22]

The court of appeals then turned to whether the exception was properly invoked, concluding Friends——not the City——was entitled to summary judgment, even though Friends never moved for summary judgment.[23] Accordingly, it reversed the circuit court and remanded the case, directing the circuit court to calculate the appropriate award of attorney fees to Friends. The majority/lead opinion concludes the court of appeals erroneously held the exception codified in Wis. Stat. § 19.85(1)(e) did not apply. The City filed a petition for review, which we granted.

## II. ANALYSIS

### A. Standard of Review

¶53 We review a grant of summary judgment independently. <u>Kemper Indep. Ins. v. Islami</u>, 2021 WI 53, ¶13, 397 Wis. 2d 394, 959 N.W.2d 912 (quoting <u>Talley v. Mustafa</u>, 2018 WI 47, ¶12, 381

---

[22] <u>Id.</u>, ¶34

[23] <u>Id.</u>, ¶51.

10

Wis. 2d 393, 911 N.W.2d 55). Summary judgment is appropriate if no material facts are at issue and a moving party is entitled to judgment as a matter of law. See Wis. Stat. § 802.08(2) (2019-20). Under Wis. Stat. § 802.08(6) (2019-20), "[i]f it shall appear to the court that the party against whom a motion for summary judgment is asserted is entitled to a summary judgment, the summary judgment may be awarded to such party even though the party has not moved therefor."

¶54 Whether a requester prevailed in an action despite the absence of favorable court relief requires us to interpret Wis. Stat. § 19.37(2)(a). Statutory interpretation presents a question of law, which we review independently. T.L.E.-C. v. S.E., 2021 WI 56, ¶13, 397 Wis. 2d 462, 960 N.W.2d 391 (citing State v. Stephenson, 2020 WI 92, ¶18, 394 Wis. 2d 703, 951 N.W.2d 819); see also Zellner v. Cedarburg Sch. Dist., 2007 WI 53, ¶17, 300 Wis. 2d 290, 731 N.W.2d 240 (citation omitted).

B. Stare Decisis & Court of Appeals Precedent

¶55 The Latin term "stare decisis" means "to stand by things decided." Stare decisis, Black's Law Dictionary. Sometimes called "[t]he doctrine of precedent," stare decisis beseeches judges to "follow earlier judicial decisions when the same points arise again in litigation." Id.

¶56 Stare decisis encompasses two related but distinct concepts——vertical stare decisis and horizontal stare decisis:

> Vertical stare decisis applies between higher and lower courts in a single system——for example, the Wisconsin Supreme Court and the Wisconsin court of appeals and circuit courts . . . . The doctrine requires lower courts to faithfully apply the

11

decisions of higher courts in their system——even if the lower courts believe those decisions erroneous—— unless those higher courts have overturned them. This doctrine, that higher courts bind lower courts, is absolute and near-universally accepted . . . .

Horizontal stare decisis . . . operates within the same court, requiring it to adhere to its own prior decisions . . . .

Daniel R. Suhr & Kevin LeRoy, The Past and the Present: Stare Decisis in Wisconsin Law, 102 Marq. L. Rev. 839, 844-45 (2019). Compare Vertical stare decisis, Black's Law Dictionary ("The doctrine that a court must strictly follow the decisions handed down by higher courts within the same jurisdiction."), with Horizontal stare decisis, Black's Law Dictionary ("The doctrine that a court, esp. an appellate court, must adhere to its own prior decisions, unless it finds compelling reasons to overrule itself.").

¶57 We have recognized a third form of stare decisis, which may be unique to Wisconsin: "the doctrine of stare decisis applies to published court of appeals opinions and requires this court 'to follow court of appeals precedent unless a compelling reason exists to overrule it.'" Manitowoc County v. Samuel J.H., 2013 WI 68, ¶5 n.2, 349 Wis. 2d 202, 833 N.W.2d 109 (quoting Wenke, 274 Wis. 2d 220, ¶21); see also Wis. Stat. § 752.41(2) (2019-20) ("Officially published opinions of the court of appeals shall have statewide precedential effect.").

¶58 This third type of stare decisis is not recognized in other jurisdictions in America. See Bryan A. Garner et al., The Law of Judicial Precedent 255 (2016) ("Inferior-court decisions

have less precedential worth because courts superior in rank aren't bound by them and may overrule, vacate, reverse, or depublish them."); H. Campbell Black, The Principle of Stare Decisis, 34 Am. L. Reg. 745, 751 (1886) ("The opinion of a Nisi Prius court, though, perhaps, admissible as persuasive evidence of the principle contended for, is of course, not binding as precedent upon the appellate court[.]"). But see John Cleland Wells, A Treatise on the Doctrine of Res Adjudicata and Stare Decisis 553 (1878) ("Moreover, the decisions of inferior courts are binding upon superior courts, sometimes, although, perhaps, more on the principle of res adjudicata which relates chiefly to fact, than on that of stare decisis which relates to law.").

¶59 This third form of stare decisis is "somewhat paradoxical[.]" Suhr & LeRoy, Stare Decisis in Wisconsin Law, at 844 n.25. Article VII of the Wisconsin Constitution unequivocally makes this court "a supreme judicial tribunal over the whole state[.]" Petition of Heil, 230 Wis. 428, 436, 284 N.W. 42 (1938) (per curiam) (quoting Attorney General v. Chi. & N.W. Ry., 35 Wis. 425, 518 (1874)). The court of appeals was created in 1978 by constitutional amendment so that this court could focus on its law-developing function. Matthew E. Garbys, Comment, A Shift in the Bottleneck: The Appellate Caseload Problem Twenty Years After the Creation of the Wisconsin Court of Appeals, 1998 Wis. L. Rev. 1547, 1548. A 1973 report to the governor explained:

> In the rush to cope with its increasing calendar, the Supreme Court must invariably sacrifice quality for quantity. Increasing appellate backlogs necessarily produce a dilution in craftsmanship. . . . The

13

Supreme Court is cast in the role of a "case-deciding court"——one which merely reacts to individual cases and thus slights its law-stating function.

. . . .

The size of this caseload can only have a detrimental effect on the quality of the Supreme Court's work. Cases involving major questions of substantive law may be decided on the basis of superficial issues.

Citizens Study Comm. on Jud. Org., Report to Governor Patrick J. Lucey 78 (1973) (on file at the David T. Prosser Jr. State Law Library).

¶60 Deference to decisions of the court of appeals conflicts with this court's constitutional role as the "final arbiter" on questions of Wisconsin law. See Tetra Tech EC, Inc. v. Wis. Dep't of Revenue, 2018 WI 75, ¶78, 382 Wis. 2d 496, 914 N.W.2d 21 (lead opinion) (explaining this court is the "final arbiter" on questions of state law). By lending court of appeals decisions stare decisis effect, we give the court of appeals power that is inconsistent with the constitutional structure of the Wisconsin judiciary. See Cook v. Cook, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997) (noting this court has been "designated by the constitution and the legislature as a law declaring court" (quoting State ex rel. La Crosse Tribune v. Cir. Ct. for La Crosse Cnty., 115 Wis. 2d 220, 229–30, 340 N.W.2d 460 (1983))); State ex rel. Wis. Senate v. Thompson, 144 Wis. 2d 429, 436, 424 N.W.2d 385 (1988) ("[I]t is this court's function to develop and clarify the law." (citations omitted)); State v. Hermann, 2015 WI 84, ¶154, 364 Wis. 2d 336, 867 N.W.2d 772 (Ziegler, J., concurring) ("Unlike a circuit court or the court of appeals, the supreme court serves a law development

14

purpose[.]"); <u>Sussex Tool & Supply, Inc. v. Mainline Sewer & Water, Inc.</u>, 231 Wis. 2d 404, 416 n.4, 605 N.W.2d 620 (Ct. App. 1999) ("We are primarily an error-correcting court, not a law-declaring court." (citation omitted)); <u>State v. Grawien</u>, 123 Wis. 2d 428, 432, 367 N.W.2d 816 (Ct. App. 1985) ("The Wisconsin Supreme Court, unlike the court of appeals, has been designated by the constitution and the legislature as a law-declaring court. While the court of appeals also serves a law-declaring function, such pronouncements should not occur in cases of great moment." (internal citation omitted)). We must not "slight[]" our "law-stating function"——the precise problem the people of this state sought to prevent by creating the court of appeals. <u>See</u> Citizens Study Comm. on Jud. Org., <u>Report to Governor Patrick J. Lucey</u>, at 78.

¶61 The heavy docket of the court of appeals renders that court better suited for deciding cases in accordance with established precedent rather than formulating new precedent itself:

> One reason why lower-court decisions are often unsuited to establish precedent is the nature of the decisional process itself. Generally, lower-court decisions are shorter than published opinions of higher courts and contain less reasoning because those courts' primary job is to rule on cases then pending, not shape the law. . . . In states that provide a right of first appeal, intermediate appellate courts may . . . have a heavy caseload. So intermediate appellate courts . . . don't have as much time or as many resources to devote to resolving a case as high courts with discretionary jurisdiction. The press of judicial business may result in opinions that aren't so thoroughly researched and closely reasoned. They may prove therefore less valuable as precedent.

15

Garner et al., The Law of Judicial Precedent, at 256–57. In Wisconsin, litigants have a constitutional right to a direct appeal, and the legislature has designated the court of appeals as the institution responsible for effectuating that right. See State v. Pope, 2019 WI 106, ¶21, 389 Wis. 2d 390, 936 N.W.2d 606 (citing Wis. Const. art. I, § 21(1) and Wis. Stat. § 808.02). Approximately 2059 cases were filed in the court of appeals last year.[24] Each court of appeals judge was responsible for deciding, on average, 132 cases.[25] In contrast, last term this court resolved 97 cases——including attorney disciplinary cases, judicial disciplinary cases, and bar admissions cases.[26]

¶62 Perhaps implicitly recognizing that giving stare decisis effect to court of appeals decisions is inconsistent with our constitutional structure, we have overturned court of appeals decisions without even mentioning stare decisis. See, e.g., Waukesha County v. E.J.W., 2021 WI 85, ¶¶37–38, 399 Wis. 2d 471, 966 N.W.2d 590 (overturning parts of Marathon County v. R.J.O., 2020 WI App 20, 392 Wis. 2d 157, 943 N.W.2d 898 without any discussion of stare decisis). Twice this term, we have suggested court of appeals decisions are entitled to significantly less weight than our own decisions. See State

---

[24] Court of Appeals Annual Report 1 (2020), https://www.wicourts.gov/ca/DisplayDocument.pdf?content=pdf&seqNo=391847.

[25] Id. at 2.

[26] Wisconsin Supreme Court Annual Statistical Report 1 (October 6, 2021), https://www.wicourts.gov/sc/DisplayDocument.pdf?content=pdf&seqNo=439770.

16

v. Yakich, 2022 WI 8, ¶31, 400 Wis. 2d 549, 970 N.W.2d 12 ("While respecting court of appeals precedent is an important consideration, it is not determinative." (quoting State v. Lira, 2021 WI 81, ¶45, 399 Wis. 2d 419, 966 N.W.2d 605)); Lira, 399 Wis. 2d 419, ¶45 ("This court has never applied the five factors commonly used in a decision to overturn supreme court caselaw to override an interpretation derived solely from the court of appeals. Further, we have shown a repeated willingness to interpret and apply the law correctly, irrespective of a court of appeals decision that came to a different conclusion." (internal citation omitted)); see also Suhr & LeRoy, Stare Decisis in Wisconsin, at 844 n.25 ("In practice, the Wisconsin Supreme Court likely grants less stare decisis effect to opinions of the Court of Appeals than of its own." (citation omitted)).

¶63 This court's practice, if not always its words, confirms that published court of appeals decisions are not entitled to stare decisis effect. These decisions are precedential; lower courts throughout the state must follow them. The supreme court, however, is not so bound. Referencing stare decisis in the context of court of appeals precedent has created confusion with no benefit. We should take this opportunity to unequivocally correct this court's misspeak in Manitowoc County.

¶64 Regardless, stare decisis is a judicially-created policy and "not an inexorable command;" for this reason, we will overturn precedent if it is objectively wrong. Johnson

17

Controls, Inc. v. Employers Ins. of Wausau, 2003 WI 108, ¶97, 264 Wis. 2d 60, 665 N.W.2d 257 (citing Hohn v. United States, 524 U.S. 236, 251 (1998)); see also Smith v. Allwright, 321 U.S. 649, 665 (1944) ("[W]hen convinced of former error, this Court has never felt constrained to follow precedent."). Historically, the judiciary has prioritized declaring the law correctly over perpetuating errors in judgment in the name of stability in the law. "We cannot mistake 'the law' for 'the opinion of the judge' because "the judge may mistake the law.'" Johnson v. Wis. Elections Comm'n, 2022 WI 14, ¶259, 400 Wis. 2d 626, 971 N.W.2d 402 (Rebecca Grassl Bradley, J., dissenting) (quoting Introduction, William Blackstone, Commentaries *71)). Because judges are not infallible, their decisions must not be insulated from later review:

> A Court is not bound to give the like judgment, which had been given by a former Court, unless they are of opinion that the first judgment was according to law; for any Court may err; and if a Judge conceives, that a judgment given by a former Court is erroneous, he ought not in conscience to give the like judgment, he being sworn to judge according to law. Acting otherwise would have this consequence; because one man has been wronged by a judicial determination, therefore every man, having a like cause, ought to be wronged also.

Kerlin's Lessee v. Bull, 1 Dall. 175, 178 (Pa. 1786).

¶65 To avoid the injustice of subjecting parties in perpetuity to erroneous holdings, "[t]he primary and most important factor to weigh in considering whether to overrule an earlier decision is its correctness." Johnson, 400 Wis. 2d 626, ¶259 (quoting Garner et al., The Law of Judicial Precedent, at 397). "[W]e do more damage to the rule of law by obstinately

18

refusing to admit errors, thereby perpetuating injustice, than by overturning an erroneous decision." State v. Roberson, 2019 WI 102, ¶49, 389 Wis. 2d 813, 935 N.W.2d 813 (quoting Johnson Controls, 264 Wis. 2d 60, ¶100). "By applying demonstrably erroneous precedent instead of the relevant law's text[,] . . . the Court exercises 'force' and 'will,' two attributes the People did not give it." Gamble v. United States, 139 S. Ct. 1960, 1981 (2019) (Thomas, J., concurring) (quoting The Federalist No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed. 1961)).

¶66 Although judges are particularly reluctant to depart from the doctrine of stare decisis with respect to a holding repeatedly applied, "[e]ven a series of decisions are not always conclusive evidence of what is law; and the revision of a decision very often resolves itself into a mere question of expediency[.]" 1 James Kent, Commentaries on American Law 476 (New York, Clayton & Norden, 3d ed. 1836). Courts tend to follow their earlier decisions because it is easy but not necessarily because the decisions were correct. See Bartlett v. Evers, 2020 WI 68, ¶200, 393 Wis. 2d 172, 945 N.W.2d 172 (Kelly, J., concurring/dissenting). No matter how long a decision has enjoyed judicial acquiescence, no amount of time can cure the error: "[T]he law of precedent has less relation to mere numbers, than to the decisive nature of the conclusions announced, and the deliberation and care with which they have been investigated." Wells, A Treatise on the Doctrine of Res Adjudicata and Stare Decisis, at 535; see also Monroe v. Pape,

19

365 U.S. 167, 220-21 (1961) (Frankfurter, J., dissenting) ("[T]he relevant demands of stare decisis do not preclude considering, for the first time thoroughly and in the light of the best available evidence . . . , a statutory interpretation which started as an unexamined assumption on the basis of inapplicable citations and has the claim of a dogma solely through reiteration.").

¶67 Revisiting erroneous precedent is particularly imperative when the precedent under review was established by the Wisconsin Court of Appeals. As explained in our seminal decision in Cook v. Cook, the court of appeals lacks constitutional authority to overrule, modify, or withdraw language from its published decisions. 208 Wis. 2d at 189-90. Consequently, a single erroneous interpretation can easily permeate a line of cases without any reconsideration by the court of appeals of its correctness. In Cook, we encouraged the court of appeals to "signal its disfavor to litigants, lawyers and this court by certifying the appeal to this court, explaining that it believes a prior case was wrongly decided." 208 Wis. 2d at 189. We also noted the court of appeals could apply its prior decision while expressly stating its concern that the decision was erroneous. Id. As an empirical matter, however, the court of appeals rarely exercises these options. In this case, for example, the court of appeals acknowledged conflicting precedent but nonetheless utilized neither of the

20

options we outlined in Cook.[27]  Last term we received only seven requests for certification from the court of appeals.[28]

¶68  The people of Wisconsin established this court as the supreme judicial tribunal and in fulfilling our constitutional

_____

[27] Friends of Frame Park, 394 Wis. 2d 387, ¶29.  In this case, the court of appeals violated Cook by following Young, which modified the Racine Education Association I Line. Although Young pre-dated Cook, our decision in Cook applies retroactively.  State v. Bolden, 2003 WI App 155, ¶10, 265 Wis. 2d 853, 667 N.W.2d 364 ("Although Jackson and Kuehl preceded Cook, this makes no difference.  Cook based its ruling on 'power' not policy.  If the court of appeals lacked the 'power' to overrule or modify its prior decisions after Cook, it certainly also lacked that power before Cook.").

Before Cook, if two published court of appeals decisions conflicted, the court often "pick[ed] the one [it] like[d]." Adam S. Bazelon, Practice Tips:  Dealing with Conflicting Court of Appeals Opinions, Wis. Law., Dec. 2009, at 22, 23, https://www.wisbar.org/NewsPublications/WisconsinLawyer/pages/article.aspx?Volume=82&Issue=12&ArticleID=1794#16 (quoted source omitted) (second and third modification in the original).  Post-Cook, the earlier decision prevails because the court of appeals lacked the power to modify it:

> If a court finds that the later court of appeals decision overruled or modified a prior court of appeals decision, the court must follow the earlier decision.  This is because the court of appeals lacks the power to overturn its own precedent and exceeds its jurisdiction by doing so.  In contrast, when the court of appeals is confronted with conflicting supreme court precedent, it must follow the supreme court's most recent pronouncement.

Id.  In this case, the court of appeals acknowledged it had to "reconcile what, at least superficially, appears to be inconsistent language from prior decisions addressing how and whether a public records plaintiff can recover attorney fees following voluntary release during litigation."  Friends of Frame Park, 394 Wis. 2d 387, ¶4.  Had the court applied Cook, it would have been bound to apply the Racine Education Association I Line instead.

[28] Wisconsin Supreme Court Annual Statistics, at 3.

duty to declare the law in this state, we may overturn any incorrect court of appeals opinion with no consideration of the stare decisis doctrine. Of particular relevance in this case, "the principle of stare decisis . . . does not require us 'to adhere to interpretations of statutes that are objectively wrong.'" Samuel J.H., 349 Wis. 2d 202, ¶5 n.2 (quoting Wenke, 274 Wis. 2d 220, ¶21). "Reflexively cloaking every judicial opinion with the adornment of stare decisis threatens the rule of law, particularly when applied to interpretations wholly unsupported by the statute's text." Manitowoc v. Lanning, 2018 WI 6, ¶81 n.5, 379 Wis. 2d 189, 906 N.W.2d 130 (Rebecca Grassl Bradley, J., concurring). While court of appeals opinions may be helpful to this court in ascertaining a statute's meaning, "[i]t should be borne in mind that the mere text [of the law], and only the text . . . was adopted[.]" Frederick Douglass, The Constitution of the United States: Is It Pro-Slavery or Anti-Slavery?, Speech Delivered at Glasgow, Scotland (March 26, 1860); see also Michael Sinclair, Traditional Tools of Statutory Interpretation 13 (1942) ("After the plain text of a statute, precedent is the most significant, the most ubiquitous, and the most powerful of the traditional tools of statutory construction." (emphasis added)). "By recognizing that 'a law is the best expositor of itself,' courts can faithfully fulfill their function as neutral arbiters." Wis. Jud. Comm'n v. Woldt, 2021 WI 73, ¶92, 398 Wis. 2d 482, 961 N.W.2d 854 (Rebecca Grassl Bradley, J., concurring/dissenting) (quoting Pennington v. Coxe, 6 U.S. (2 Cranch) 33, 52 (1804)).

22

### C. The Court of Appeals Precedent

¶69 The Racine Education Association I Line is objectively wrong, and the Young/Portage Cases applied by the court of appeals in this case depart even further from proper statutory interpretation. I would overturn the line and the Young/Portage Cases and instead apply the actual statutory text.

¶70 For context, the legislature rewrote Wisconsin's public record laws in 1982, inspired in part by Congress's enactment of the Freedom of Information Act (FOIA) in the late 1960s. Linda De La Mora, Comment, The Wisconsin Public Records Law, 67 Marq. L. Rev. 65, 65 (1983). FOIA permitted federal district courts to award attorney fees to requesters who "substantially prevailed" in an action. 5 U.S.C. § 552(a)(4)(E) (1976). Although Wis. Stat. § 19.37(2)(a), which was created during this re-write, uses slightly different language, it seems to have been based on the language in FOIA.

¶71 A student-authored law review comment published in 1983 suggested Wisconsin courts should look to "existing federal case law" to interpret Wis. Stat. § 19.37(2)(a). Mora, The Wisconsin Public Records Law, at 104 & nn.293-95. The court of appeals has done just that, parroting federal decisions that have been abrogated instead of applying the text of § 19.37(2)(a).

#### 1. The Racine Education Association I Line

¶72 In 1986, the court of appeals interpreted Wis. Stat. § 19.37(2)(a) for the first time in Racine Education Association I, 129 Wis. 2d 319. A teachers union requested records from a

23

school district showing who was a member of a bargaining unit. Id. at 323. The district did not respond, so the union filed a mandamus action. Id. The district argued an exception applied——specifically, Wis. Stat. § 19.35(1)(*l*), which states that compliance with a request is not mandated if a new record would need to be made by extracting information from existing records. Id. The district did note, however, that it was in the process of compiling the information for reasons unrelated to the request. Id. While the action was pending, the district released the requested records. Id. The circuit court dismissed the action as moot. Id. at 322. The union appealed, arguing it was entitled to an award of attorney fees. Id.

¶73 The court of appeals reversed and remanded for factfinding. Id. at 330. Ostensibly following the student comment's guidance, the court looked to federal decisions, primarily Cox v. United States Department of Justice, 601 F.2d 1 (D.C. Cir. 1979) (per curiam), abrogated on other grounds by Benavides v. Bureau of Prisons, 993 F.2d 257 (D.C. Cir. 1993). Cox held a requester could be deemed to have prevailed, even in the absence of favorable relief from a court, if it showed: (1) its action "could reasonably be regarded as necessary," and (2) "a causal nexus exists between that action and the agency's surrender of information." Id. at 6. In Racine Education Association I, the court explicitly adopted Cox's holding. 129 Wis. 2d at 326-28. The court stated the case, on remand, would turn "largely [on] a question of causation[.]" Id. at 327.

24

¶74 At least five subsequent cases endorsed the causal nexus requirement articulated in Racine Education Association I. See WTMJ, Inc., 204 Wis. 2d at 460; Eau Claire Press Co. v. Gordon, 176 Wis. 2d 154, 162, 499 N.W.2d 918 (Ct. App. 1993); State ex rel. Eau Claire Leader-Telegram v. Barrett, 148 Wis. 2d 769, 772-73, 436 N.W.2d 885 (Ct. App. 1989); Racine Educ. Ass'n v. Bd. of Educ. for Racine Unified Sch. Dist., 145 Wis. 2d 518, 522-23, 427 N.W.2d 414 (Ct. App. 1988); Vaughan, 143 Wis. 2d at 871-73. Despite each case invoking the causal nexus test, some reached apparently contradictory results. For example, in State ex rel. Eau Claire Leader-Telegram v. Barrett, a newspaper requested sealed settlement documents filed in several circuit court cases (the "Edson case"). 148 Wis. 2d at 770. Eventually, the newspaper filed a mandamus action. The clerk of court and the circuit court judge who presided over the Edson case, Judge Roderick Cameron, reached a stipulation with the newspaper, under which Judge Cameron agreed to release the records if no party to the Edson case objected. Id. at 771. Several parties did object, the newspaper intervened to argue for disclosure, and Judge Cameron released an edited version of the documents. Id. The newspaper moved for an award of attorney fees in the mandamus action. The court of appeals concluded the newspaper's intervention in the Edson case caused the release of the records——not the mandamus action——so it was not entitled to attorney fees. Id. at 772.

¶75 In Eau Claire Press Co. v. Gordon, 176 Wis. 2d 154, the court of appeals reached the opposite conclusion. A

25

newspaper requested records from a city related to a settlement in a discrimination case. Id. at 157. The city attorney denied the request, citing a confidentiality agreement the city had entered into with the plaintiff. Id. The newspaper filed a mandamus action, and during its pendency, the plaintiff in the discrimination case agreed not to consider the release of the settlement records a breach of the confidentiality agreement. Id. at 158. Thereafter, the city released the records. Id. The circuit court denied the newspaper's motion for an award of attorney fees because, in its view, the plaintiff's agreement not to consider the release a breach was the cause of the release. Id. at 161. The court of appeals concluded, irrespective of the plaintiff's agreement, the mandamus action was a substantial factor in causing the release of the records, so an award of attorney fees was appropriate. Id. at 162.

### 2. The Young/Portage Cases

¶76 In two cases, the court of appeals departed from its own precedent requiring a causal nexus. In State ex rel. Young v. Shaw, 165 Wis. 2d 276, the requester was allegedly involved in a "hit and run" in February 1989. Id. at 283. He was charged with leaving the scene of an accident on March 6. Id. On March 9, the requester made a written demand to the district attorney's office for the officer's narrative and photographs. Id. at 283-84. On March 22, the assistant district attorney responded that, because the State filed criminal charges, his demand was governed by discovery statutes applicable to criminal cases, rather than Wis. Stat. § 19.35. Id. at 284. She

26

informed the requester he would have to wait until the initial appearance on March 29 to receive the officer's narrative. Id. The requester filed a mandamus action on March 27. Id. at 285. At the March 29 initial appearance, the assistant district attorney released the officer's narrative to the requester. Id. at 291. The photographs were released at a later conference on May 9. Id. at 284. Apparently, the assistant district attorney released the records only because she thought the statutes governing criminal discovery compelled release——not because of the public records laws. See id. at 293.

¶77 The court of appeals concluded the requester prevailed in his mandamus action. It acknowledged the Racine Education Association I Line requires a requester to establish "a causal nexus" between the action and the release of the record. Id. at 292-93 (citing Racine Educ. Ass'n I, 129 Wis. 2d at 328 and quoting Cox, 601 F.2d at 61). In the admitted absence of a causal nexus, the court fashioned an exception based on what the court considered an unreasonable delay in the release of the officer's narrative and the photographs——grounded in a good faith but legally unavailing reliance on the criminal discovery statutes. See id. at 293-95. Under "these circumstances," the court reasoned, to "deprive" a requester of his ability to recover attorney fees would "frustrate and indeed negate the purpose of the open records law rather than encourage compliance with it." Id. at 293. The court nevertheless concluded the requester was not entitled to attorney fees because he represented himself pro se——apparently, in the court's view,

27

that would also frustrate and indeed negate the law's purpose. Id. at 295-96.

¶78 In the second case to ignore the causal nexus text, a newspaper requested a copy of an investigative report from a sheriff. Portage Daily Reg., 308 Wis. 2d 357, ¶1. The sheriff denied the request because the district attorney was considering criminal charges. Id. The newspaper filed a mandamus action; thereafter, the report was made public. Id., ¶6. The newspaper moved for an award of attorney fees, which the circuit court denied. It concluded that the denial was stated in "sufficiently specific" terms and satisfied the balancing test. Id., ¶1. The issue on appeal was whether the denial was legal. Notably, the court of appeals did not decide whether the newspaper was entitled to an award of attorney fees; it simply said a decision on the merits was warranted, i.e., the case was not moot, because the decision would impact whether attorney fees could be awarded. Id., ¶8 & n.4. Portage Daily Register did not address any precedent on what it means for a party to prevail.

D. The Meaning of Prevailing Party

¶79 The court of appeals' varying interpretations of the statute governing the recovery of attorney fees in public records cases are "objectively wrong." Wenke, 274 Wis. 2d 220, ¶21. Wisconsin Stat. § 19.37(2)(a) provides, in relevant part: "[T]he court shall award reasonable attorney fees . . . to the requester if the requester prevails in whole or in substantial part in any action filed under sub. (1) relating to access to a

28

record or part of a record under s. 19.35 (1)(a)." (Emphasis added.) The court of appeals never considered whether "prevails . . . in any action" bears an accepted legal meaning. It does.

¶80 As we explained in Kalal, "[s]tatutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." 271 Wis. 2d 633, ¶45 (citing Bruno v. Milwaukee County, 260 Wis. 2d 633, ¶¶8, 20, 260 Wis. 2d 633, 660 N.W.2d 656). "Legal terms of art" qualify as technical words or phrases, so we give them "their accepted legal meaning." Bank Mut., 326 Wis. 2d 521, ¶23 (quoting Estate of Matteson, 309 Wis. 2d 311, ¶22).

¶81 "When the legislature adopts a phrase from the common law that has a specific legal meaning and does not otherwise define it, we presume that the legislature adopts the phrase's specific legal meaning." State v. Matthews, 2021 WI 42, ¶9, 397 Wis. 2d 1, 959 N.W.2d 640 (citing Bank Mut., 326 Wis. 2d 521, ¶39 and Strenke v. Hogner, 2005 WI 25, ¶28, 279 Wis. 2d 52, 694 N.W.2d 296); see also Buckhannon, 532 U.S. at 615-16 (Scalia, J., concurring) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning[.]" (quoting Morissette v. United States, 342 U.S. 246, 263 (1992))); 2A Sutherland Statutory Construction § 47:30 n.1 (7th ed. updated Nov. 2020) ("Courts presume that a

29

legislature that employs a term of art knows and adopts the cluster of ideas attached to each borrowed word in the body of learning from which it is taken." (citations omitted)); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 320 (2012) ("A statute that uses a common-law term, without defining it, adopts its common-law meaning.").

¶82 Consultation of legal dictionaries is not only appropriate, but, to some extent, necessary to properly interpret Wis. Stat. § 19.37(2)(a). See, e.g., State v. Schaefer, 2008 WI 25, ¶¶29-31, 308 Wis. 2d 279, 746 N.W.2d 547 (consulting Black's Law Dictionary to determine the meaning of "discovery"). Black's Law Dictionary defines "prevail" as: "(17c) 1. To obtain the relief sought in an action; to win a lawsuit <the plaintiff prevailed in the Supreme Court>." Prevail, Black's Law Dictionary. "Relief" is defined as: "3. The redress or benefit, esp. equitable in nature (such as an injunction or specific performance), that a party asks of a court. — Also termed remedy." Relief, Black's Law Dictionary. Similarly, Black's Law Dictionary defines "prevailing party" as: "(17c) A party in whose favor a judgment is rendered, regardless of the amount of damages awarded <in certain cases, the court will award attorney's fees to the prevailing party>. — Also termed successful party." Prevailing party, Black's Law Dictionary; see also Union of Needletrades, Indus. & Textile Emps., AFL-CIO, CLC v. U.S. Immigr. & Naturalization Serv., 336 F.3d 200, 207-08 (2d Cir. 2003) ("UNITE's primary contention on appeal is that a party that 'substantially prevails' (or a

30

'substantially prevailing party') under FOIA is necessarily different from a 'prevailing party' . . . . Several considerations leave us unconvinced."). As Black's Law Dictionary notes, the definitions of "prevail" and "prevailing party" trace to the seventeenth century——long before the 1982 enactment of Wis. Stat. § 19.37(2)(a).

¶83 The meaning of "prevailing party" had endured in the law, unaltered. Black's Law Dictionary notes that "prevailing party" is synonymous with "successful party." Prevailing party, Black's Law Dictionary. Another legal dictionary, published in 1920, provides a single definition of "successful": "The word 'successful' . . . in relation to the allowance of attorney fees to the plaintiff . . . means a termination of the action in his favor by a decree[.]" Successful, Legal Definitions (1920) (emphasis added) (citation omitted).

¶84 A legal dictionary from 1879 illustrates the meaning of "prevail" by summarizing the holdings of five cases. Prevail, Dictionary of Terms and Phrases Used in American or English Jurisprudence (1879).

- In Bangor & Piscataquis R. R. Co. v. Chamberlain, a landowner sued a railroad company for damages stemming from a taking. 60 Me. 285, 285 (1872). County commissioners awarded the landowner $650. Id. at 286. The railroad company appealed. Id. On appeal, a jury reduced the award to $435. Id. A Maine statute provided that: "When an appeal is taken, the losing party is to pay the cost thereon." Id. The Maine Supreme Court had to decide which party was to pay the costs of the appeal, framing the issue as: "[W]hich was the prevailing party?" Id. Logically, because the losing party did not prevail, the court held the landowner prevailed, concluding he "successfully maintained his claim for damages[.]" Id.

31

- In <u>Hawkins v. Nowland</u>, the Missouri Supreme Court concluded that the plaintiff was a "prevailing party," although the favorable judgment he recovered was not "what he claimed[.]" 53 Mo. 328, 330 (1873).

- In <u>Henry v. Miller</u>, the Maine Supreme Court concluded a creditor was a "prevailing party" even though he obtained a judgment for less than he sought. 61 Me. 105, 105 (1872).

- In <u>Rogers v. City of St. Charles</u>, the Missouri Supreme Court concluded a city that obtained a verdict of condemnation was a "prevailing party," entitled to costs. 54 Mo. 229, 233-34 (1873) (per curiam).

- In <u>Weston v. Wright</u>, the Vermont Supreme Court concluded an orator had "prevailed" because he had established he was entitled to a decree, although the decree was less favorable than the relief he sought. 45 Vt. 531, 535-37 (1873).

None of these cases declared a party "prevailed" without obtaining favorable relief from a court.

¶85 Consistent with these settled definitions, a statute renumbered by this court in 1975 stated: "**Judgment.** In such actions, when the plaintiff prevails, he shall, <u>in addition to judgment</u> for damages and costs, also have judgment that the nuisance be abated unless the court shall otherwise order." Sup. Ct. Order, 67 Wis. 2d 585, 762 (1975) (codified as amended at Wis. Stat. § 823.03) (emphasis added). This statute presupposes that a prevailing party obtained a favorable judgment in court.

¶86 As evidenced by its stable legal history, "'[p]revailing party' is not some newfangled legal term invented for use in late-20th-century fee-shifting statutes." <u>Buckhannon</u>, 532 U.S. at 610. In <u>Buckhannon</u>, Justice Antonin Scalia wrote in concurrence he was aware of "no cases, state or

32

federal" prior to 1976 that endorsed the catalyst theory. Id. at 611. After Wis. Stat. § 19.37(2)(a) was enacted in 1982, the court of appeals adopted the catalyst theory, which conflicts with the longstanding meaning of what it means to prevail in a court case. A "fair reading" of a statute requires adherence to the statute's text as it was understood at the time of the statute's enactment. Scalia & Garner, Reading Law, at 33.

¶87 To "prevail[] in whole or in substantial part in any action filed under sub. (1)," a requester must obtain through a court order at least some of the relief it sought. See Meinecke v. Thyes, 2021 WI App 58, ¶1, 399 Wis. 2d 1, 963 N.W.2d 816 ("[The plaintiff] contends she prevailed in substantial part in her mandamus action when the circuit court ordered the release of some but not all of the records that she requested from public officials. We agree.").

¶88 The accepted legal meaning of "prevails . . . in any action" also matches its common, ordinary meaning. See Kalal, 271 Wis. 2d 633, ¶45 (citing Bruno, 260 Wis. 2d 633, ¶¶8, 20). In common parlance, prevailing in a mandamus action is not equivalent to obtaining access to a public record by other means. Justice Scalia illustrated the difference in his Buckhannon concurrence:

> If a nuisance suit is mooted because the defendant asphalt plant has gone bankrupt and ceased operations, one would not normally call the plaintiff the prevailing party. And it would make no difference, as far as the propriety of that characterization is concerned, if the plant did not go bankrupt but moved to a new location to avoid the expense of litigation. In one sense the plaintiff would have "prevailed"; but he would not be the prevailing party in the lawsuit.

532 U.S. at 615. In designating a plaintiff who obtained access to records by means other than a court judgment a "prevailing party," the court of appeals either excised "in any action filed under sub. (1)" from the statutory text or rewrote the phrase to say "_after_ any action filed under sub. (1)." We have no power to rewrite the words chosen by the legislature. E.g., State v. Fitzgerald, 2019 WI 69, ¶30, 387 Wis. 2d 384, 929 N.W.2d 165.[29]

¶89 The court of appeals' interpretations of what it means to prevail in a mandamus action have also been undermined by "changes or developments in the law." See Roberson, 389 Wis. 2d 190, ¶50 (quoting Bartholomew, 293 Wis. 2d 38, ¶33). Specifically, they rest on the now-defunct "catalyst theory," which the United States Supreme Court rejected more than 20 years ago. Buckhannon, 532 U.S. at 600 (majority opinion).

¶90 In Buckhannon, the plaintiff brought claims under the Fair Housing Amendments Act (FHAA) and the Americans with Disabilities Act (ADA) against West Virginia (and two of its agencies), arguing that a state statute violated these federal

---

[29] Even following the Racine Education Association I Line defeats Friends' claim for attorney fees. "[A]n allegedly prevailing complainant must assert something more than post hoc, ergo propter hoc[.]" Racine Educ. Ass'n I, 129 Wis. 2d at 326–27 (quoting Cox v. U.S. Dep't of Just., 601 F.2d 1, 6 (D.C. Cir. 1979) (per curiam)). Timing is not sufficient to demonstrate causation. If it were, causation would effectively be eliminated as an element altogether because any time an action were filed and a custodian thereafter released the requested record, as in this case, the requester would be able to recover attorney fees.

laws. Id. at 601. Before the district court rendered a decision, the West Virginia Legislature eliminated the statutory requirement. Id. The defendants then moved to dismiss the case as moot. Id. The district court granted the motion and the Fourth Circuit affirmed, rejecting the plaintiff's claim that it was entitled to attorney fees.[30] Id. at 601-02.

¶91 The United States Supreme Court interpreted the meaning of "prevailing party" in fee-shifting schemes permitted in the FHAA[31] and the ADA.[32] Id. at 601. The Court stated:

> Now that the issue is squarely presented, it behooves us to reconcile the plain language of the statutes with our prior holdings. We have only awarded attorney's fees where the plaintiff has received a judgment on the merits, or obtained a court-ordered

---

[30] The majority/lead opinion is confusing. On the one hand, it claims to endorse the test articulated in Buckhannon. On the other, it refuses to acknowledge this case is moot. The entire point of Buckhannon was to determine under what circumstances, if any, a party could be deemed to have prevailed even though the case became moot, thereby barring favorable relief.

The majority/lead opinion's misunderstanding of Buckhannon has serious implications. While the majority/lead opinion states the test correctly (to prevail, a party must receive favorable relief from a court), it never applies the test. Instead, it turns to the merits without identifying any favorable relief to which Friends might be entitled at this point. The prevailing party test is not a merits determination; if it were, Buckhannon would have been about the merits of the plaintiff's FHAA and ADA claims, which it never addressed.

[31] 42 U.S.C. § 3601(c)(2) (2001) ("[T]he court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee and cost.").

[32] 42 U.S.C. § 12105 (2001) ("[T]he court . . ., in its discretion, may allow the prevailing party . . . a reasonable attorney's fee[.]").

consent decree . . . .  <u>Never have we awarded</u>
<u>attorney's fees for nonjudicial alterations of actual</u>
<u>circumstances</u>.

<u>Id.</u> at 605-06 (second emphasis added) (internal quotations and citations omitted).  The Court noted that "prevailing party" was a "rather clear" phrase, which did not encompass the catalyst theory.  <u>Id.</u> at 607.  It explicitly relied on <u>Black's Law Dictionary</u>.  <u>Id.</u> at 603 (quoting <u>Prevailing party</u>, <u>Black's Law Dictionary</u> (7th ed. 1999)).

¶92 <u>Buckhannon</u> destroyed the foundation of the court of appeals precedent.  The <u>Racine Education Association I</u> Line rests on federal decisions interpreting FOIA and employing the catalyst theory, specifically, <u>Cox</u>, 601 F.2d 1.  <u>Buckhannon</u> abrogated <u>Cox</u> and similar federal cases.  The Ninth Circuit recognized this in <u>Oregon Natural Desert Association v. Locke</u>, noting that <u>Buckhannon</u>'s rejection of the catalyst theory logically extends to FOIA.[33]  572 F.3d 610, 614-16 (9th Cir. 2009).  Similarly, in <u>Oil, Chemical & Atomic Workers International Union, AFL-CIO v. Department of Energy</u>, the D.C. Circuit, quoting <u>Buckhannon</u>, held "that in order for plaintiffs in FOIA actions to become eligible for an award of attorney's fees, they must have 'been awarded some relief by [a] court,' either in a judgment on the merits or in a court-ordered consent decree."  288 F.3d 452, 456-57 (D.C. Cir. 2002), <u>superseded by</u>

---

[33] The Ninth Circuit noted a 2007 amendment to FOIA "modified FOIA's provision for the recovery of attorney fees to ensure that FOIA complainants who relied on the catalyst theory to obtain an award of attorney fees would not be subject to the <u>Buckhannon</u> proscription."  <u>Or. Nat. Desert Ass'n v. Locke</u>, 572 F.3d 610, 615 (9th Cir. 2009).

36

statute as stated by Summers v. Dep't of Just., 569 F.3d 500 (D.C. 2009) (quoting Buckhannon, 532 U.S. at 603).

¶93 Even if the United States Supreme Court had not disavowed the catalyst theory, our own court of appeals cases are nonetheless "unsound in principle." See Roberson, 389 Wis. 2d 190, ¶50 (quoting Bartholomew, 293 Wis. 2d 38, ¶33). They failed to follow our well-established rule of statutory interpretation that legal terminology must be given its "accepted legal meaning." Bank Mut., 326 Wis. 2d 521, ¶23 (quoting Estate of Matteson, 309 Wis. 2d 311, ¶22). Choosing alternative meanings, particularly to advance preferred policies, destabilizes the law. See Scalia & Garner, Reading Law, at 320. Additionally, judicial tampering with accepted legal meaning interferes with the legislature's ability to make law. See Wisconsin Bill Drafting Manual § 2.03(2)(a)(2019-20) (advising drafters at the Legislative Reference Bureau to consider whether a word or phrase is "self-defining" by consulting "standard or legal dictionaries").

¶94 Problematically, the Young/Portage Cases are principally grounded in public policy rather than the text of Wis. Stat. § 19.37(2)(a). In Young, the court reasoned to "deprive" a requester of his ability to recover attorney fees would "frustrate and indeed negate the purpose of the open records law rather than encourage compliance with it." 165 Wis. 2d at 293. This sort of consequentialist reasoning is antithetical to our textualist approach, articulated in Kalal, 271 Wis. 2d 633. See Clean Wis., Inc. v. Dep't Nat. Res., 2021

37

WI 71, ¶86, 398 Wis. 2d 346, 961 N.W.2d 346 (Rebecca Grassl Bradley, J., dissenting) (explaining Kalal is Wisconsin's "most cited case of modern times" (quoting Daniel R. Suhr, Interpreting Wisconsin Statutes, 100 Marq. L. Rev. 969, 969-70 (2017))). Consequentialists "urge that statutes should be construed to produce sensible, desirable results, since that is surely what the legislature must have intended. But it is precisely because people differ over what is sensible and what is desirable that we elect those who will write our laws——and expect courts to observe what has been written." Scalia & Garner, Reading Law, at 22.

¶95 Kalal rejected the very purposivism and consequentialism employed by the court of appeals in this case as well as its predecessors. "It is the enacted law, not the [legislature's] unenacted intent, that is binding on the public." Kalal, 271 Wis. 2d 633, ¶44. Faithfulness to the text of a law rather than advancing an imagined purpose underlying its enactment or avoiding a consequence deemed unsavory (in the subjective opinion of the judge) is a condition precedent to the rule of law:

> The principles of statutory interpretation that we have restated here are rooted in and fundamental to the rule of law. Ours is "a government of laws not men," and "it is simply incompatible with democratic government, or indeed, even with fair government, to have the meaning of a law determined by what the lawgiver meant, rather than by what the lawgiver promulgated." "It is the law that governs, not the intent of the lawgiver . . . . Men may intend what they will; but it is only the laws that they enact which bind us."

38

Id., ¶52 (quoting Antonin Scalia, A Matter of Interpretation 17 (1997)); see also J. Times v. City of Racine Bd. of Police & Fire Comm'r, 2015 WI 56, ¶117, 362 Wis. 2d 577, 866 N.W.2d 563 (Abrahamson, J., concurring) (explaining "it seems that the Newspaper was sandbagged" but nonetheless concluding "the Newspaper has not sufficiently tethered its argument to the language of Wis. Stat. § 19.37(2)(a)").

¶96 When courts lose sight of this first principle, when they "fail to follow the . . . letter of the positive law," too easily are "the most valuable privileges of the people . . . rendered illusory" "under the pretense of explaining and extending them[.]" Francis Stoughton Sullivan, Lectures on the Constitution and Laws of England 64 (1805). Although judges may profess well-intentioned justifications for "improving" the law, "interpretive approaches can be used for all kinds of purposes, not just beneficent ones." Bryan A. Garner, Old-Fashioned Textualism Is All About Interpretation, Not Legislating from the Bench, ABA J., Apr. 2019.[34] Ignoring the law's plain meaning because the result in a particular case is, in a judge's subjective judgment, "appealing," causes "considerable mischief." Force v. Am. Family Mut. Ins., 2014 WI 82, ¶148, 356 Wis. 2d 582, 850 N.W.2d 866 (Roggensack, J., dissenting). "One can always do 'more' in pursuit of a goal, but statutes have limits." N.A.A.C.P. v. Am. Fam. Mut. Ins., 978 F.2d 287, 298 (7th Cir. 1992). Those limits are prescribed by the people's representatives in the legislature and

---

[34] https://www.abajournal.com/magazine/article/textualism-means-what-it-says.

discarding them disrupts the constitutional order by allowing judges to act as policy-makers. "While textualism cannot prevent the incursion of policy preferences into legal analysis . . . without textualism, such encroachment is certain." Woldt, 398 Wis. 2d 482, ¶92. The people of Wisconsin elect judges to interpret the law, not make it.

¶97 Even a cursory reading of the court of appeals precedent on awarding attorney fees in public records cases reveals it is "incoherent" and "unworkable in practice," presenting yet another reason to overturn it. See Roberson, 389 Wis. 2d 190, ¶50 (quoting Bartholomew, 293 Wis. 2d 38, ¶33). In this case, the court of appeals struggled to "reconcile what, at least superficially, appears to be inconsistent language from prior decisions addressing how and whether a public records plaintiff can recover attorney fees following voluntary release during litigation."[35] Applying the statutory text would ensure consistent and predictable application of the law, eliminating the subjectivity inherent in determining who "prevailed" in a suit.

¶98 When the United States Supreme Court rejected the catalyst theory in Buckhannon, it criticized the theory's subjectivity. 532 U.S. at 609-10. The dissent proposed four conditions precedent for a plaintiff to be deemed to have prevailed under the catalyst theory:

- "A plaintiff first had to show that the defendant provided some of the benefit sought by the lawsuit." Id.

---

[35] Friends of Frame Park, 394 Wis. 2d 387, ¶29.

40

at 627 (Ginsburg, J., dissenting) (citations and quotations omitted).

- "[A] plaintiff had to demonstrate as well that the suit stated a genuine claim, i.e., one that was at least colorable, not frivolous, unreasonable, or groundless." Id. (citations and quotations omitted).

- "Plaintiff . . . had to establish that her suit was a substantial or significant cause of defendant's action providing relief." Id. at 628 (citations and quotations omitted).

- "[Sometimes] plaintiff had to satisfy the trial court that the suit achieved results by threat of victory, not by dint of nuisance and threat of expenses." Id. (citations and quotations omitted).

¶99 The majority opinion dismissed this version of the catalyst theory as "clearly not a formula for ready administrability" and likely to "spawn[] a second litigation of significant dimension[.]" Id. at 609-10 (majority opinion) (quoting Tex. State Tchrs. Ass'n v. Garland Indep't Sch. Dist., 489 U.S. 782, 791 (1989)). Determining a plaintiff's entitlement to attorney fees would require litigating the merits of a moot public records case, but the United States Supreme Court has cautioned "[a] request for attorney's fees should not result in a second major litigation[.]" Id. (quoting Hensley v. Eckerhart, 461 U.S. 424, 437 (1983)). Disregarding Buckhannon, the majority/lead opinion's approach will produce unnecessary litigation.

¶100 The legislature forcefully declared the purpose of the public records laws:

In recognition of the fact that a representative government is dependent upon an informed electorate, it is declared to be the public policy of this state that all persons are entitled to the greatest possible information regarding the affairs of government and

41

the official acts of those officers and employees who represent them. Further, providing persons with such information is declared to be an essential function of a representative government and an integral part of the routine duties of officers and employees whose responsibility it is to provide such information. To that end, ss. 19.32 to 19.37 shall be construed in every instance with a presumption of complete public access, consistent with the conduct of governmental business. The denial of public access generally is contrary to the public interest, and only in an exceptional case may access be denied.

Wis. Stat. § 19.31. A declaration of policy is a permissible indicator of a statute's plain meaning——but only to a degree. Scalia & Garner, Reading Law, at 217-18. In this case, Wis. Stat. § 19.37(2)(a) employs legal terminology with a meaning ensconced in the law long ago and used in substantially similar form in many other statutes.[36] Legal terms of art employed throughout a code of law must be interpreted consistently to preserve stability and predictability in the law.

### III. CONCLUSION

¶101 This court properly reverses the metamorphosis in public records law created by the court of appeals' atextual interpretation of what it means to prevail in a court action. Friends did not obtain any favorable relief in court. This case was moot almost as soon as it began. We should say so, and overturn court of appeals precedent crafted to advance the policy preferences of judges at the expense of the law's text. The majority/lead opinion reached the right outcome for the wrong reasons, declining to recognize the case is moot and

---

[36] See, e.g., Wis. Stat. § 19.59(8)(d); Wis. Stat. § 30.49(2)(b); Wis. Stat. § 134.49(6)(b).

42

instead allowing litigation over the merits. I respectfully concur with the mandate.

¶102 I am authorized to state that Chief Justice ANNETTE KINGSLAND ZIEGLER and Justice PATIENCE DRAKE ROGGENSACK join this concurrence.

¶103 JILL J. KAROFSKY, J. *(dissenting)*. "Sunshine is a great disinfectant." Milwaukee J. Sentinel v. DOA, 2009 WI 79, ¶103, 319 Wis. 2d 439, 768 N.W.2d 700 (Abrahamson, J., dissenting). That's the theory behind Wisconsin's public records laws. Shine light on the government's work product and citizens will engage and hold to account their representatives, achieving a purer democracy. A majority of this court frustrates that goal, seeding clouds as it eviscerates the mandatory fee shifting provisions integral to keeping the sun shining in our great state. By reinterpreting the law to reward government actors for strategically freezing out the public's access to records, today's decision will chill the public's right to an open government. And the majority/lead opinion does not stop there. It also condones the City's patently inapplicable "competitive or bargaining" excuse to deny Friends timely access to a proposed contract. The result is that Friends are denied the attorney fees to which it is entitled for bringing a claim to enforce its rights when Friends had no other recourse. Because the majority/lead opinion reimagines the fee shifting standard too narrowly, while construing the "competitive and bargaining reasons" exception too broadly, all at the expense of our public records laws, I respectfully dissent.

I. ANALYSIS

¶104 "In recognition of the fact that a representative government is dependent upon an informed electorate, it is declared to be the public policy of this state that all persons

1

are entitled to the greatest possible information regarding the affairs of government[.]"  Wis. Stat. § 19.31.  Providing citizens meaningful and timely access to government documents is "an essential function of a representative government and an integral part of the routine duties of officers and employees whose responsibility it is to provide such information."  Id. This transparency mandate promotes public involvement, which sits at the core of Wisconsin's representative democracy.  See Nichols v. Bennet, 199 Wis. 2d 268, 273, 544 N.W.2d 428 (1996) ("The open records law serves one of the basic tenets of our democratic system by providing an opportunity for public oversight of the workings of government.").  Our state and local governments have traditionally committed themselves to this democracy-promoting transparency, so much so that former Chief Justice Abrahamson declared, "[i]f Wisconsin were not known as the Dairy State it could be known, and rightfully so, as the Sunshine State."  Schill v. Wis. Rapids Sch. Dist., 2010 WI 86, ¶1, 327 Wis. 2d 572, 786 N.W.2d 177.

¶105 A majority of this court tarnishes Wisconsin's proud history of transparent government by transforming a routine records request into a catalyst to decimate Wisconsin's fee shifting structure.  This analysis begins by addressing the majority's grievous perversion of the public records laws' critical fee shifting provisions.  Then, the analysis turns to the case at hand, first explaining how unjustified delays in releasing records burden the public.  Lastly, this analysis dismantles the City's flawed excuses for concealing the proposed

2

contract by highlighting that: (1) the record implicated no "competitive or bargaining" concern; and (2) the Common Council did not enter into a closed session as is required to invoke the "competitive or bargaining" excuse in the first place.

### A. Attorney Fees

¶106 Attorney fees are integral to open records litigation as they enable members of the public to compel the government to work transparently. This section begins with an overview of fee shifting provisions and their important role in our public records laws. Next is an explanation of how the long-standing "causation test" for awarding attorney fees is consistent with the plain meaning of Wis. Stat. § 19.37(2)(a) and deters gamesmanship from all parties in a public records action. Last is a warning about how the deleterious new standard for attorney fees may disincentivize government actors from making timely disclosures, eviscerating the very purpose of the public records laws.

#### 1. Fee shifting is integral to transparency.

¶107 In an action to enforce Wisconsin's public records laws, a requester is entitled to his or her attorney fees when "the requester prevails in whole or in substantial part." Wis. Stat. § 19.37(2)(a). This fee shifting provision serves two important purposes: (1) it enables people, particularly those with limited means, to bring enforcement actions; and (2) it incentivizes the government's voluntary compliance by penalizing

non-compliance.[1]  Fee shifting is often implemented when laws rely on the public to bring enforcement challenges.[2]  In the arena of public records, the government holds the records and no other entity reviews the government's decision to withhold or delay the release of a record.  As a result, the only enforcement mechanism is a citizen's mandamus action.[3] § 19.37(1)(a).  Without a robust fee shifting mechanism in public records laws, record requesters face a no-win scenario when a request is denied.  They can either acquiesce to the

---

[1] See Thomas D. Rowe Jr., The Legal Theory of Attorney Fee Shifting: A Critical Overview, 1982 Duke L.J. 651, 652, 54, 62, 73 (1982) (explaining that "the different concerns underlying fee shifting rationales have three major strains——equity, litigant incentives, and externalities."  At a basic level "the prevailing party, having been adjudged to be in the right, should not suffer financially for having to prove the justice of his position."  Furthermore, in explaining the "private attorney general" theory, "potential plaintiffs may well refrain from bringing socially beneficial suits because the gains would not sufficiently further their private interests."  And finally, "it can be important to effective deterrence to show by example that violators will bear the victims' enforcement costs.").

[2] See, e.g., Wis. Stat. § 100.20(5) (authorizing suit by any person harmed by unfair trade practices to recover double damages and reasonable attorney fees); Wis. Stat. § 111.18(2)(a)(3) (authorizing employees of health care institutions to commence an action to enforce prohibitions on unfair labor practices and providing for optional fee shifting to successful plaintiffs); Shands v. Castrovinci, 115 Wis. 2d 352, 358, 340 N.W.2d 506 (1983) (explaining that a tenant suing under Wis. Stat. § 100.20(5) "acts as a 'private attorney general' to enforce the tenants' rights," and thus, "not only enforces his or her individual rights, but the aggregate effect of individual suits enforces the public's rights").

[3] A citizen may also request that the district attorney or attorney general bring a mandamus action on his or her behalf, a decision entirely up to the district attorney's or attorney general's discretion.  See Wis. Stat. § 19.37(1)(b).

government's potentially unlawful withholding of the record, or they can bring a mandamus action to enforce their right to the record at the risk of substantial legal fees.

¶108 Legal fees can create significant hurdles for two common public record requesters: concerned citizens (like Friends) and local news media (appearing as amici in this case). Often, these two groups simply cannot afford the required legal costs of a mandamus action.[4] And without mandamus actions, government violations of public records laws would go largely unchecked, undermining these laws' legislatively declared purpose to promote democracy through transparency. See Wis. Stat. § 19.31; State ex rel. Newspapers, Inc. v. Showers, 135 Wis. 2d 77, 81, 398 N.W.2d 154 (1987) ("[I]f the media is denied access to the affairs of government, the public for all practical purposes is denied access as well. A democratic government cannot long survive that burden."). Furthermore, without fee shifting, the government has little incentive to timely comply with records requests——it could simply delay until the requester sinks considerable funds into litigating a mandamus action. Absent robust fee shifting, the promise of our public records laws is rendered a dead letter for all but the select few with means, leading to fewer record requests, more delays in the release of information, and, ultimately, a less informed electorate.

---

[4] The once powerful and lucrative news media industry has weakened considerably in modern times, with local news organizations often working on a shoe-string budget. See PEN America, Losing the News: The Decimation of Local Journalism and the Search for Solutions 24-31 (2019).

2. The "causation" test is efficient and textually supported.

¶109 Having established the critical importance and function of fee shifting, next is a discussion about when courts should implement this remedy. The court of appeals has long relied upon the causation test to determine whether the government should pay for a requestor's attorney fees. Under the causation test, a reviewing court looks for a "causal nexus" between the filing of a mandamus action and the document's release. Eau Claire Press Co. v. Gordon, 176 Wis. 2d 154, 160, 499 N.W.2d 918 (Ct. App. 1993) ("The test of cause in Wisconsin is whether the actor's action was a substantial factor in contributing to the result.").

¶110 The causation test appropriately captures what it means to "prevail . . . in substantial part" in a public records case and is a workable, practical test. A majority of this court, however, rejects the causation test. In its place, they would now condition attorney fees on a "judicially sanctioned change in the parties' legal relationship." Both the majority/lead and concurring opinions insist that "prevailing party" is a "legal term of art" according to Buckhannon Board and Care Home, Inc. v. West Virginia Department of Health and Human Services, 532 U.S. 598 (2001). See majority/lead op., ¶20; concurring op., ¶40. There is one glaring error with applying Buckhannon here. The phrase "prevailing party" is conspicuously absent from Wisconsin's public records law. Instead, § 19.37(2)(a) states that costs and fees must be

6

awarded "if the requester prevails in whole or in substantial part" in an action relating to a record's request.

¶111 An interpretation that equates the two phrases is flawed because a "term of art" is "a word or phrase having a specific, precise meaning in a given specialty, apart from its general meaning in ordinary contexts." See Term of Art Black's Law Dictionary (11th ed. 2019). The fact that a phrase is a term of art does not mean each word within that phrase, when used separately and independently, carries the same special meaning. Specifically, a specialized meaning for "prevailing party" does not impose that meaning on the independent use of either "party" or "prevail."

¶112 In addition, the words the legislature chose are meaningfully distinct. The legislature used the phrase "the requester prevails" in § 19.37(2)(a) instead of "prevailing party." (Emphasis added.) The use of "requester" rather than "party" is instructive as "party" connotes litigation while "requester" places the phrase in the broader context of the records request. Thus, the test derived from the term of art "prevailing party," which requires a judicially sanctioned change in a litigant's position, does not fit the specific language in Wisconsin's statutes.

¶113 Because the phrase "the requester prevails" lacks a specialized or technical meaning, the common, ordinary, and accepted meaning of those words controls. See, e.g., Stroede v. Soc'y Ins., 2021 WI 43, ¶11, 397 Wis. 2d 17, 959 N.W.2d 305. "Prevail" commonly means "to succeed." Prevail, Oxford English

Dictionary. Even under a legal-specific definition, "prevail" means "to obtain the relief sought in an action." Prevail, Black's Law Dictionary 1438 (11th ed. 2019). Under the legal definition, a requester "prevails" if the requester files a mandamus action seeking a record's release and then receives that record because it obtained the relief sought.[5] The causation test cabins this reading slightly by requiring that the filing of the action be a cause of the record's release. This limitation keeps record requesters from filing frivolous mandamus actions before obtaining records that were never in doubt of being released simply to extract fees.

¶114 Frivolous actions are one way to obstruct public records cases. Delayed disclosures represent a second way to game the system. Faust illustrates the value of addressing delayed disclosures with fee shifting as a remedy. State ex rel. Vaughan v. Faust, 143 Wis. 2d 868, 422 N.W.2d 898 (Ct. App.

---

[5] The majority/lead opinion cites other Wisconsin Statutes where a final adjudication by the court is inherently necessary to establish a party has prevailed. But in those statutes, this "judicially sanctioned change in the parties' positions" concept comes not from the use or plain meaning of "prevail" but instead from the context in which those statutes appear. See Wis. Stat. ch. 102, § 6 (1849) ("[T]he plaintiff in error on the trial anew shall be the successful and prevailing party."); Wis. Stat. ch. 109, § 6 (1849) ("If the plaintiff in such action prevail therein, he shall have judgment for double the amount of damages found by the jury."). Chapter 102 § 6 discusses the designation of parties on appeal. For there to be an appeal there must have been a judicially sanctioned resolution at trial. Chapter 109 § 6 refers to damages awarded by a jury, which again require a judicially sanctioned resolution at trial. The context of those specific statutes narrow the meaning of "prevail" in a manner not required by its plain meaning and which does not carry over to the distinct context of the public records laws.

8

1988). In Faust, an inmate requested records on January 26 and, having received no response, re-requested the records on February 19. Id. at 869. After again receiving no response, the inmate filed a mandamus action on March 13, and shortly thereafter the custodian of the records voluntarily supplied the inmate with the requested records along with an apology for the delay. Id. The court held that the mandamus action "was the precipitating cause" of the release of the records and awarded attorney fees and costs to the inmate. Id. at 872. The Faust court correctly recognized that "[i]f the government can force a party into litigation and then deprive that party of the right to recover expenses by later disclosure, it would nullify the statute's purpose." Id. Although nothing in Faust indicated that the record custodian delayed the release of records purposefully, a rule that allows such delay for any reason without fee shifting unnecessarily harms the record requester and encourages the government to deprioritize or flout this "integral part of [its] routine duties." Wis. Stat. § 19.31.

¶115 In addition to encouraging timely compliance with public records laws, the causation test also promotes judicial efficiency. In circumstances where the government releases a record before the end of trial, the test eliminates the need to adjudicate the merits of a now-moot record request. It is well established that plaintiffs in public records actions may seek attorney fees and costs despite the underlying action being moot because of the voluntary release of records. See Racine Educ. Ass'n v. Bd. of Educ. for Racine Unified Sch. Dist., 129 Wis. 2d

9

319, 322, 385 N.W.2d 510 (Ct. App. 1986); Cornucopia Inst. v. U.S. Dept. of Agric., 560 F.3d 673, 676-77 (7th Cir. 2009). The causation test sensibly premises an award of fees and costs on a finding that filing the mandamus action was reasonably necessary to receive the record and that there was a causal connection between the action and the record's release. This test allows a court to make a grounded determination on the necessary attorney fees question without fully litigating the underlying merits. The factual inquiry required under a causation test is thus necessarily limited and has been reliably applied by the lower courts for decades. Thus, we should continue to employ this textually faithful and practical test.

3. The "judicially sanctioned change" test is detrimental.

¶116 The new test, which looks for a "judicially sanctioned change" in the parties legal relationship, will result in one of two detrimental changes in how circuit courts handle public records disputes. Which detrimental change actually occurs will depend on how courts apply the test in cases where the records are voluntarily released before the underlying mandamus action reaches a final order. The new test would either: (1) completely forego the option of awarding attorney fees to a record requester when an authority voluntarily releases a record, no matter the length of delay or the stage of the action at the time of release; or (2) require that circuit courts make a determination on the underlying merits of every public records case that comes before them. The former approach, which is sanctioned by the concurrence, nullifies our

10

public records laws and allows governmental authorities to delay the release of records; the latter is judicially inefficient. The effects of a "judicially sanctioned change" test have already played out in the federal context and we should learn from those mistakes, not repeat them. Put simply, the new test casts storm clouds over our once clear public records laws.

¶117 The first possible effect from the "judicially sanctioned change" test would occur if the test is applied to remove a party's ability to seek attorney fees when the underlying case becomes moot through voluntary disclosure of documents. Under this application, the new regime creates a perverse incentive for the government to strategically delay the release of records. If public records cases can be mooted out by the government's voluntary release of a record, then the government could escape any sanction for unlawfully delaying the record's release so long as the government releases the record at any point before the court orders the release. Although the record ultimately gets released, the requester is left paying potentially hefty attorney fees and costs for a record he or she was already entitled to receive. See Milwaukee J. Sentinel, 341 Wis. 2d 607, ¶40 ("Increasing the costs of public records for a requester may inhibit access to public records and, in some instances, render the records inaccessible."). As the government can easily avoid paying a requester's attorney fees, members of the public will be disinclined to bring mandamus actions. Fewer mandamus actions will chill the public's informed involvement in government and lead to a less

11

participative democracy. Rather than aspiring to be the "sunshine state" of government transparency, we will be relegated to the long, dark winter of obfuscation.

¶118 Alternatively, the second possible effect would occur if the new test is applied to allow an award of attorney fees even when the government has already voluntarily disclosed the requested records. This approach is consistent with precedent.[6] In this situation, the new test creates judicial inefficiency because a circuit court would be required to fully adjudicate the underlying public records claim in any action alleging undue delay in a record's release. Specifically, under the new test a circuit court must determine if it officially sanctioned a change in the parties' legal relationship before shifting attorney fees. This will unnecessarily burden lower courts with intensive factual disputes.

¶119 In detrimentally changing Wisconsin's public records law, a majority of this court ignores the teachings of the past. Although the court of appeals found the federal courts' interpretation of the Freedom of Information Act (FOIA) persuasive when trying to give meaning to the phrase "prevail in whole or in substantial part,"[7] it is important to recognize that

---

[6] See Racine Educ. Ass'n v. Bd. of Educ. for Racine Unified Sch. Dist., 129 Wis. 2d 319, 322, 385 N.W.2d 510 (Ct. App. 1986); Cornucopia Inst. V. U.S. Dept. of Agric., 560 F.3d 673, 676-77 (7th Cir. 2009).

[7] See Racine Educ. Ass'n, 129 Wis. 2d 319.

12

the state and federal statutes are far from identical.[8] This court must interpret the language of our state statute independently, and thus we are given the opportunity to avoid the mistakes made by the federal courts in interpreting what it means to "prevail."

¶120 The United States Supreme Court interpreted "prevailing party," in a non-public records context, to mean the party that was awarded some relief by the court. Buckhannon, 532 U.S. at 603. That interpretation was read to alter FOIA's similar "prevailing party" fee shifting provision. 5 U.S.C. § 552 (2018). In response to this judicial change, and to protect the plain meaning of FOIA's fee shifting rule and underlying purpose, Congress found it necessary to amend FOIA to make it as clear as possible that the catalyst theory (the federal counterpart to Wisconsin's causation test) still applied to FOIA's prevailing party test. See First Amend. Coal. V. U.S. Dept. of Just., 878 F.3d 1119, 1128 (9th Cir. 2017).

¶121 History repeats itself. This court commits the same error as the federal courts, but does so egregiously within the context of Wisconsin's public records laws and with full

---

[8] Wisconsin's public records law is not modeled on FOIA and no Wisconsin court has held that our interpretation of the public records law is in lock-step with FOIA. Among other significant differences, Wisconsin's law provides for mandatory fee shifting while FOIA's fee shifting is optional, Wisconsin's fee shifting provision references "the requestor" while FOIA references "the complainant," and Wisconsin's law includes the strong declaration of policy that is entirely absent from FOIA. See Wis. Stat. §§ 19.31 & 19.37 as compared to 5 U.S.C. § 552.

13

knowledge of the fallout.[9]  We should avoid repeating this error and rely on the plain text.  The plain text contemplates the long-standing causation test that better realizes our public records laws' textually expressed purpose and promotes judicial efficiency.

B.  Importance of Timely Access to Documents

¶122 Deviation from absolute governmental transparency is permitted "when not detrimental to the public interest."  State ex rel. Youmans v. Owens, 28 Wis. 2d 672, 681, 137 N.W.2d 470 (1965); see Wis. Stat. § 19.35(1)(a) (incorporating common law principles construing access rights to government records).  In practice, governmental authorities are to perform a balancing test to determine whether "the public interest would be adversely affected" by the record's release.  See State ex rel. J. Co. v. Cnty. Ct. for Racine Cnty., 43 Wis. 2d 297, 306, 168 N.W.2d 836 (1969).  Withholding a record requires exceptional circumstances as "only in an exceptional case may access be denied." § 19.31.

¶123 Here exceptional circumstances do not exist.  At issue is the City's denial of Friends' access to a proposed contract. The proposed contract involved Big Top Baseball's plan to repurpose Frame Park, a public space, to host a private for-profit baseball team.  In October 2017, Friends filed a public records request with the City seeking the proposed contract.

---

[9] Cf. Catherine R. Albiston & Laura Beth Nielsen, The Procedural Attack on Civil Rights: The Empirical Reality of Buchannon for the Private Attorney General, 54 UCLA L. Rev. 1087 (2007).

Later that same month, the City declared it was withholding the proposed contract "for competitive and bargaining reasons" until the Common Council had an opportunity to take action on it. The next opportunity for the Common Council to take action on the proposed contract was at the December 19 Common Council meeting. Having been denied access to the record in time to meaningfully engage and hold to account their representatives, Friends filed a mandamus action the day before the meeting to preserve its right to a remedy. The December 19 Common Council meeting minutes indicate that the Council: (1) never entered into a closed session to discuss the proposed contract; and (2) did not vote to either approve or deny the contract terms. Unclear from either the minutes or the record is to what extent the Council discussed the proposed contract, if at all. The next day the City released the proposed contract to Friends saying no further competitive or bargaining concerns existed.

¶124 Friends was entitled to the release of the proposed contract not only in spite of its draft status, but because of it.[10] The contract's non-final nature was significant. As long

---

[10] There is no dispute that the "draft contract" here is a "record" subject to disclosure under Wis. Stat. § 19.32(2). This is because at the time of Friends' request, Big Top Baseball had already seen the proposed contract and was actively negotiating its terms. See Fox v. Bock, 149 Wis. 2d 403, 414, 438 N.W.2d 589 (1989) (clarifying that the statutory definition of a "record" subject to release includes "a document prepared for something other than the originator's personal use, whether it is in preliminary form or stamped 'draft.'"). Here, despite the majority/lead opinion's contrary assertion, it is inconsequential to the balancing test that the Common Council had not yet finalized the contract because finality is not required.

15

as the contract was not final, Friends had the opportunity to meaningfully participate in the Common Council's review of the document. Said differently, once the Common Council voted on the proposed contract, Friends' participation would be moot. This situation exemplifies why Wisconsin's public records law demands that responses to record requests be made "as soon as practicable and without delay." Wis. Stat. § 19.35(4)(a). Only when citizens are timely informed about the actions of government officials may they meaningfully participate and create a more responsive representative government. This is particularly true at the local government level where informed citizens often have direct access to their officials and have the ability to plead their case face-to-face. In other words, the delayed release of public records "in effect eliminate[es] that information from the public debate" thereby "defeat[ing] the purpose . . . of providing the public with the greatest information possible about the affairs of government" and completely denying the opportunity to meaningfully participate in government. State ex rel. Auchinleck v. Town of LaGrange, 200 Wis. 2d 585, 595, 547 N.W.2d 587 (1996).

¶125 Such detrimental denial occurs even when the delay is short-lived. Here, Friends requested the proposed contract ostensibly to evaluate how the possible terms of a privately run baseball park operating on public park grounds would affect its members as neighbors and taxpayers. For that review to be meaningful, however, Friends needed the document before the Common Council finalized the contract. Once the contract is

16

final and binding, public input is rendered irrelevant. Because Friends was "entitled to the greatest possible information regarding the affairs of government," Wis. Stat. § 19.31 (emphasis added), the City carries the burden to prove that it did not unduly delay the release of the requested record.

### C. The City Withholding the Proposed Contract Lacked Justification

¶126 The City claims that "competitive or bargaining" reasons were sufficiently exceptional to tip the balance in favor of denying access to the proposed contract. This excuse fails. The "competitive or bargaining" excuse derives from Wisconsin's related open meetings law, which is incorporated into the public records laws. See Wis. Stat. §§ 19.35(1)(a) & 19.85(1)(e). Under the open meetings law, access to a government meeting may be denied (that is, a "closed session" may be held) for "[d]eliberating or negotiating the purchasing of public properties, the investing of public funds, or conducting other specified public business, whenever competitive or bargaining reasons require a closed session." § 19.85(1)(e). Importantly, the government may withhold a record on this ground "only if the authority . . . makes a specific demonstration that there is a need to restrict public access at the time that the request to inspect or copy the record is made." § 19.35(1)(a).

¶127 The City's "competitive or bargaining" rationale fails for two reasons in this case. First, no competitive or bargaining concerns remained at the time the City denied the records request. Second, the City Council never entered into a closed session during its December 19th meeting. Therefore, the

17

City improperly balanced the public interest by concluding that the proposed contract's release would have adversely affected the public. See State ex rel. J. Co., 43 Wis. 2d at 306.

    1.  No competitive or bargaining reasons existed.

¶128 Let's turn first to the "competitive or bargaining" interests that were absent at the time the proposed contract was withheld.  A competitive or bargaining concern relating to the proposed contract may have arisen in one of three ways, none of which apply here:  (1) the City and another municipality could have been competing for the same baseball team; (2) the City could have been negotiating with more than one baseball organization to host a team at Frame Park; or (3) the manner of the City's negotiations with Big Top could require that the proposed contract terms be secreted from Big Top to strengthen the City's bargaining position.

¶129 Regarding the first possible concern, the City does not allege that another municipality was competing to host the same baseball team.  Rather, the City claims that the mere possibility of another municipality's interest in a baseball team is enough to invoke the exception.  And yet the City fails to explain how another municipality's possible interest in a baseball team implicates competitive or bargaining concerns sufficient to justify nondisclosure.  A mere possibility of competition is a nebulous standard that could plausibly be invoked for any public business the City conducts, a far cry from the "exceptional case" that may justify a denial or delay of a record request.  See Wis. Stat. § 19.31.

18

¶130 The second possible concern would emerge if the City were negotiating with two or more baseball teams competing for the Frame Park location. Under this scenario, the City would arguably have an interest in concealing the details of any proposed contracts from the competing teams so that the City could negotiate the best terms from each team and ultimately choose between them. But here, the record makes clear that the City did not consider partnering with any baseball team besides Big Top after August of 2016——long before the record request and denial in October 2017.

¶131 The third possible concern would be that publicly revealing a proposed contract's unapproved terms would necessarily give Big Top access to those terms, weakening the City's negotiating position. This too fails because, as a conceded fact, Big Top already had access to the entire proposed contract during their negotiations and had provided drafting suggestions.

¶132 In sum, the competitive or bargaining benefit of withholding the proposed contract from the public did not exist. According to the City, the only relevant party not to have seen the proposed contract before the December 19 meeting was the Common Council, and the City cannot seek a bargaining advantage against its own Common Council.

¶133 Curiously, although the Common Council never substantially addressed the proposed contract or entered into a closed session at the December 19 meeting, the City released the proposed contract the day after the meeting indicating no

19

further competitive or bargaining concerns existed. That all but concedes there never were competitive or bargaining concerns. If no competitive or bargaining concerns existed after a meeting where the Common Council never meaningfully addressed the proposed contract, then how could competitive or bargaining concerns be implicated before the meeting took place?

¶134 The City argues that there were, nevertheless, bargaining reasons for the Common Council to go into closed session to review the proposed contract. Specifically, the City argues that the Council's reactions to the proposed contract terms would weaken its ability to further negotiate terms with Big Top. But if the City wanted to hide the Common Council's reactions to proposed contract terms, the solution was to have the Common Council go into a closed session, not withhold disclosure of the proposed contract Big Top had already seen and red-lined. In short, no qualifying competitive or bargaining concerns regarding the proposed contract exist in the record.

2. A closed session was not "required."

¶135 Even if competitive or bargaining concerns existed prior to the December 19 meeting, the City still improperly withheld the proposed contract because the Common Council never entered into a closed session. The City's only reason for denying disclosure applies "whenever competitive or bargaining reasons <u>require</u> a closed session." Wis. Stat. § 19.85(1)(e) (emphasis added). But the Common Council never entered into a closed session at the December 19 meeting. How could a closed

20

session have been required when the Common Council never met in closed session?

¶136 The facts indicate an alternative motive for withholding the proposed contract——the City sought to avoid public input before the Common Council had the opportunity to act on it. The City admitted as much in its letter explaining that it would delay disclosure until "after the Common Council has taken action on it." That is not a legal basis to withhold a record from the public.

¶137 Because the City's alleged competitive or bargaining concerns were speculative at best, and disproven by the record at worst, the City improperly applied the balancing test. The public's interest in disclosure outweighs the City's nonexistent competitive or bargaining concerns; the disclosure was unlawfully delayed.

## II.  CONCLUSION

¶138 The City improperly withheld the proposed contract when it cited to nonexistent "competitive or bargaining" concerns, and the public interest would not have been adversely affected by the release of the proposed contract. Friends was denied its statutory right to access documents that would have informed its participation in government. As such, Friends should have prevailed in its action against the City and been awarded appropriate fees and costs. The unnecessarily narrow "judicially sanctioned change" test for the award of attorney fees is not supported by the statute's plain meaning and will undercut the public records laws' entire purpose. We should

remain with the causation test, which encourages citizens to bring meritorious claims for the release of records while discouraging gamesmanship on all sides. We should continue to disinfect with sunshine.

¶139 I am authorized to state that Justices ANN WALSH BRADLEY and REBECCA FRANK DALLET join this dissent.